JAMES E. RONAN *et al.*, Plaintiffs-Appellees, *v.* KEN RITTMUELLER *et al.*, Defendants-Appellants.

Second District   No. 80-945

Opinion filed March 30, 1982.

Theodore D. Voska, of Wheaton, and Mark Schuster and Daniel Weiler, both of Gromer, Abbott, Wittenstrom and Strom, of Elgin, for appellants.

Phillip Solzun, of Palatine, for appellees.

JUSTICE NASH delivered the opinion of the court:

Defendants, Kenneth Ritmueller and Ralph Obenauf, appeal from a judgment of the circuit court of McHenry County, sitting without a jury, finding them liable to plaintiffs for $20,000 in actual and $20,000 in exemplary damages for fraudulent misrepresentations. Defendants essentially contend that plaintiffs failed to prove them guilty of fraud by clear and convincing evidence.

Although plaintiffs have not filed a brief in this court we consider the appeal under the standards set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 133, 345 N.E.2d 493, 494; see also *Roqueplot v. Roqueplot* (1980), 88 Ill. App. 3d 59, 60, 410 N.E.2d 441, 442.

Plaintiffs' complaint was brought in two counts. Count I was directed against the individual defendants and count II against defendant Kensu Enterprises, Inc., an Illinois corporation. A default judgment was entered against the corporation and damages by it assessed at $20,000 in favor of plaintiffs. The corporation has not appealed from that judgment.

Evidence was produced in trial that in 1976 plaintiffs owned a five-acre parcel of real estate in McHenry County upon which they wished to

erect their residence. The Ronans were referred to Kensu Enterprises, Inc., as a reputable builder. Kensu was incorporated in 1974 for the purpose of the construction of homes, and its stock was closely held by defendant Rittmueller and his wife. On September 17, 1976, plaintiffs met with defendant Obenauf, Kensu's salesman, and Rittmueller, its president, at the corporate office in Woodstock. They brought with them a survey of their land and a house plan taken from a magazine and were advised by defendants that Kensu would have an architect prepare a preliminary plan from it. Defendants advised plaintiffs the residence they desired would cost $48,500. Plaintiffs responded they could not afford more than $47,000 and asked how much down payment would be required. Defendants responded that 10% of the total price would be adequate with the balance payable when the house was almost completed. Plaintiffs also met with defendants to view other homes constructed by Kensu near Elgin. On October 4, however, Mrs. Ronan called the Kensu offices and spoke to Obenauf advising him plaintiffs had decided to wait until spring to build the home.

On October 20 Obenauf called Mrs. Ronan and advised her that if plaintiffs wished to build for $47,000 they would have to do so now as the cost of the home would go up at least $3,000 in the spring. Mrs. Ronan testified Obenauf told her the contract would have to be made at once because of an impending price increase for lumber and building materials which would become effective on November 1, causing a $3,000 increase in the cost of the home. He also stated Kensu had employed an additional crew of carpenters and that construction could start immediately and be under roof by Christmas. She told him to prepare the building contract and that plaintiffs would discuss it and meet with defendants on October 29 at their office.

Mrs. Ronan testified that, based on these representations, plaintiffs decided to proceed with the building. They then secured a loan from their bank for $10,000 and met with defendants on October 29. A construction contract drawn by Rittmueller was tendered to plaintiffs which specified a down payment of $20,000 and for partial additional payments totaling $27,000 to be made during construction. Plaintiffs questioned the amount of the down payment and were advised by Obenauf and Rittmueller that it was required in order to purchase the necessary building materials before the November 1 price increase and store them until needed. Plaintiffs were again told that Kensu had employed another carpenter crew who would start at once, completing construction by Christmas, although the contract tendered to them by Rittmueller provided only for construction to commence by December 15, 1976. The plaintiffs then entered into the contract on that date with Rittmueller signing on behalf of Kensu.

In trial, both defendants denied making the representations attrib-

uted to them by Mrs. Ronan. Obenauf initially could not recall the conversation but stated on cross-examination they "could be true." He suggested it was possible he was referring to pulling one of the crews Kensu had working on Rittmueller's personal residence the corporation was then building. Rittmueller testified he had not made the representations to plaintiffs and "doubted" whether Obenauf had done so. He stated plaintiffs offered the additional down payment of their own volition in order to secure a price guarantee of $47,000 and for the deletion of an escalator clause from the contract. Rittmueller agreed that no building materials were ever purchased for the construction of plaintiffs' house.

On October 29, after signing the contract, plaintiffs returned to their bank and borrowed an additional $10,000 and delivered a check for $20,000 to Kensu's office on October 30. At that time, Obenauf told Mr. Ronan that necessary building permits would be secured right away and percolation tests on their land completed in the following week. Obenauf delivered the check to Rittmueller who deposited it in Kensu's account; it had apparently been overdrawn at that time as the balance after the $20,000 was deposited was $18,479.

No work or construction was ever undertaken by defendants on plaintiff's property although weather conditions were favorable and defendants continually promised to start soon. On December 17 Mrs. Ronan attempted to telephone Rittmueller but his business phone had been disconnected. She subsequently did reach him and was advised he had business problems and couldn't do anything on the house at that time. Mrs. Ronan requested return of the $20,000 deposit, and Rittmueller informed her he could not do so as it had been used in the operation of Kensu. He said he could possibly build her house in the spring, but did not do so.

The Ronans repaid their interim $20,000 loan by remortgaging their old home causing their monthly payments for principal and interest to increase from $142 to $260.40 for a period of 15 years.

In trial, George Cumpata, a certified public accountant, testified that Kensu had financial difficulties since its inception in 1974 and that cash flow problems in 1976 occurred because the company took on too much work. In October 1976 Rittmueller, on behalf of Kensu, had borrowed $50,000 to be repaid in 30 days in order to finance the company's operation. At that time, Kensu was building a large house for the personal use of Rittmueller and his wife on a tract of land they jointly owned. Rittmueller testified that in the fall of 1976 he had intended to use the land and new house as collateral in order to increase the working capital of the corporation. He planned to borrow $180,000 so as to repay the $50,000 due to his bank in November, with the remaining $130,000 for working capital but he was not successful. The bank refused the new loan and

demanded payment of the $50,000 when in mid-November it was learned that a number of mechanic's liens had been filed against Rittmueller's property: on September 27 for $5,289, on October 23 for $944, on November 10 for $5,474, on November 15 and 16 for $11,603 with six additional liens being filed between November 20 and December 9, 1976. As a result of denial of the $180,000 loan Kensu ceased to function.

During October 1976, $68,175 was deposited in the corporate bank account as was $23,953 in November. These funds, which included the Ronan's $20,000, were credited as accounts receivable paid upon the three houses Kensu was building as of October 4. Rittmueller testified that although $90,000 was deposited in the corporate account after October 1, neither he nor his wife received any funds from the corporation from 1974 through 1976 other than reimbursements for expenses or repayment of officer loans made to it. The money was expended on corporate overhead, materials, wages, machinery, attorney fees and antecedent debts. Kensu had 10 or 12 employees as of November 1, 1976, and they were last paid on November 23. Rittmueller acknowledged that much of Kensu's financial outlay for costs incurred during this period was a direct result of the house being built for his personal use by Kensu; the contract for that construction was signed by Rittmueller both as buyer-owner and as president-general contractor of Kensu. The plaintiffs' $20,000 deposit could not be traced in Kensu's expenditures as its accounting system failed to segregate funds and their application by job, although Kensu's accountant testified that this was an acceptable practice for this type of business.

Rittmueller further testified he believed the corporation to be in sound financial condition until about the third week in November. He disclaimed any knowledge of unsatisfied judgments or recorded liens as of October 29 although when cross-examined as to his knowledge of the pending corporate insolvency he admitted he didn't honestly know whether he knew or not, but that it was possible he did know as of that date. He acknowledged that no building permits were applied for or final construction plans obtained for plaintiffs' residence.

Defendant Obenauf testified he had been a salaried salesman for Kensu and was not an officer or shareholder. He had been so employed for four months before the meetings with the plaintiffs and did not see the contract with them until after it had been drawn up. He denied making oral representations to plaintiffs although he stated he may have told them the house could be under roof by December 15, 1976. Obenauf denied having any knowledge of the disposition of plaintiffs' deposit or any statement regarding the increased cost of materials or additional work crews.

■■ For a misrepresentation to be the basis for a charge of fraud it must

contain the following elements: (1) it must be a statement of material fact as opposed to opinion; (2) it must be untrue; (3) the party making the statement must know or believe it to be untrue or be aware he is ignorant as to its truth; (4) the person to whom the statement is made must believe and rely on it and have a right to do so; (5) it must have been made for the purpose of inducing the other party to act; and (6) reliance by the person to whom the statement is made must lead to his injury. (*Bissett v. Gooch* (1980), 87 Ill. App. 3d 1132, 1138, 409 N.E.2d 515, 519; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 48, 390 N.E.2d 393, 403.) Fraud is never presumed, but must be proved by clear and convincing evidence. *Ray v. Winter* (1977), 67 Ill. 2d 296, 304, 367 N.E.2d 678, 682; *Allenworth v. Ben Franklin Savings & Loan Association* (1979), 71 Ill. App. 3d 1041, 1045, 389 N.E.2d 684, 687.

In *Citizens Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315, 322-23, 214 N.E.2d 612, 615-16, *appeal denied* (1966), 33 Ill. 2d 627, the court noted:

> "There is no general rule for determining what facts will constitute fraud; whether or not it is found depends upon the special facts of each particular case. [Citation.] Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether suppression of truth or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, or by word of mouth or by look and gesture. [Citation.] As a general rule a corporate officer or director is not liable for the fraud of other officers or agents merely because of his official character, but he is individually liable for fraudulent acts of his own or in which he participates. 19 Am Jur2d Corporations par 1384. The mere fact that a person is an officer or director does not per se render him liable for the fraud of the corporation or of other officers or directors. He is liable only if he with knowledge, or recklessly without it, participates or assists in the fraud."

The trial court in the present case found that based upon the evidence of the financial difficulties of Kensu; Rittmueller's intimate knowledge and control of the corporate finances; and, his participation in the preparation and execution of the contract with plaintiffs at a time when the corporation was in a very difficult cash situation, made it clear he directed and participated with Obenauf in the fraud against plaintiffs. The court also found that Obenauf did misrepresent the need and purpose of the $20,000 down payment required of plaintiffs; that such statements were material and untrue and made to induce plaintiffs to make a large down payment; that Obenauf knew them to be untrue; and

that plaintiffs believed and relied upon the misrepresentations in entering into the contract.

We find the conclusions drawn by the trial court as to Rittmueller are supported by the evidence. The trial judge is in a superior position to evaluate that evidence and the credibility of the witnesses and his findings will not be disturbed unless they are against the manifest weight of the evidence. *Rosenbaum v. Rosenbaum* (1981), 94 Ill. App. 3d 352, 355, 418 N.E.2d 939, 941; *Callahan v. Rickey* (1981), 93 Ill. App. 3d 916, 919, 418 N.E.2d 167, 170

■■ ■ Rittmueller's argument that the trial court's finding that plaintiffs' down payment was represented to be for the purchase of materials adds nothing to the fraud is without merit. It clearly was relevant both to the inducement and justifiable reliance of plaintiffs on the representations. (*Adams Laboratories, Inc. v. Jacobs Engineering Co.* (N.D. Ill. 1980), 486 F. Supp. 383, 386; *Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 196, 380 N.E.2d 1040, 1045.) He also asserts that it was not proved that the promise to buy and store materials on or before November 1, if made, was known or believed by him to be false. If there, in fact, was a price increase (no evidence was offered by any party), Rittmueller failed to take advantage of it and buy materials for plaintiffs' house with their money as he had represented he would. If there was no price increase, fraud becomes even clearer. As the court stated in *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 50, 390 N.E.2d 393, 404-05, "[t]he absence of direct evidence on this point, however, is not necessarily fatal to a plaintiff's case, since knowledge of the defendant may be proved by means of circumstantial evidence. [Citation.] Such circumstantial evidence may justify an inference of knowledge that may stand unless rebutted. [Citation]. Such inferences are particularly apt where the matter in question is peculiarly within the range of facts known to the defendants. [Citation.]"

■■ Rittmueller argues that plaintiffs have only shown a promise of some future act and, therefore, no actionable misrepresentation occurred. Illinois law denies recovery for fraud based on a false representation of intention or of future conduct except, however, where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud. In that case, equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334, 371 N.E.2d 634, 641; *Carey Electric Contracting, Inc. v. First National Bank* (1979), 74 Ill. App. 3d 233, 237, 392 N.E.2d 759, 763; *Shanahan v. Schindler* (1978), 63 Ill. App. 3d 82, 94, 379 N.E.2d 1307, 1316, *appeal denied* (1978), 71 Ill. 2d 621.) Even a false representation of

intention or future conduct, if amounting to a matter of fact, has been held to support an action for fraud. (*Carroll v. First National Bank* (7th Cir. 1969), 413 F.2d 353, *cert. denied* (1970), 396 U.S. 1003, 24 L. Ed. 2d 494, 90 S. Ct. 552.) Rittmueller personally and through his agent, Obenauf, promised to purchase materials in advance of an alleged price increase, add a carpenter crew and build plaintiffs' house at once, completing it by Christmas. None of these representations were carried out. The trial court could well find from the evidence that such representations, made without the intent or ability to perform while intending plaintiffs to rely upon them, demonstrated a scheme to defraud plaintiffs and were actionable. (See *Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 408 N.E.2d 782.) A scheme to defraud may consist of suggestions and promises as to the future when not made in good faith but with deceptive intent. *United States v. Herr* (7th Cir. 1964), 338 F.2d 607, 610, *cert. denied* (1966), 382 U.S. 999, 15 L. Ed. 2d 487, 86 S. Ct. 563.

■■ Rittmueller also argues that as Mrs. Ronan was a real estate salesperson for seven years she knew the significance of contracts and therefore could not justifiably rely on the representation that her house would be started at once and finished by Christmas as the "time of commencement" clause in the contract specified that work on the Ronan house "shall be commenced approximately December 15, 1976." As the court noted in *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 52, 390 N.E.2d 393, 406, "it is well established that the terms of any written contract executed in conjunction with fraud are irrelevant to a cause of action grounded not in contract but in tort. [Citations.] Likewise, we see no particular evidentiary significance in plaintiffs' having signed a contract disclaiming any additional representations, when they have produced evidence that such representations were in fact made to them." The fact Mrs. Ronan sold real estate is of little significance. Defendant may not persuasively argue in these circumstances that his victim had no right to believe him. *Reimer v. Leshtz* (1980), 90 Ill. App. 3d 980, 984, 414 N.E.2d 114, 117.

■■ Rittmueller finally contends that the trial court should have raised a presumption against plaintiffs that the testimony of plaintiff, James E. Ronan, who was not called as a witness, would have been adverse to their case. It has long been the law in Illinois that the presumption or inference against a party failing to produce proof apparently within his own power does not apply to the failure of a party to a civil suit to testify in his own behalf. (*Village of Princeville v. Hitchcock* (1902), 101 Ill. App. 588, 591-92.) There are other motives that may influence a party to forego becoming a witness in his own behalf than the consciousness that the facts within his knowledge would be damaging if disclosed and the presump-

tion that testimony would have been prejudicial to the parties' case arises only when that party has willfully withheld such evidence. *Haynes v. Coca Cola Bottling Co.* (1976), 39 Ill. App. 3d 39, 46, 350 N.E.2d 20, 26.

■■ We conclude the evidence was sufficient to establish fraudulent misrepresentations by defendant Rittmueller to plaintiffs' damage.

■■ We reach a different conclusion in the case against defendant Obenauf. In our view there was a lack of evidence that he knew the representations attributed to him were false or had any knowledge of the financial condition of Kensu or Rittmueller. Obenauf had been so employed only four months as a salaried salesman. While it is well established that one who knowingly participates in a fraudulent act is guilty of fraud (*Citizens Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315, 323, 214 N.E.2d 612, 616, *appeal denied* (1966), 33 Ill. 2d 627), plaintiffs have failed to provide proof this defendant had knowledge that the contract could not be performed.

Accordingly, the judgment of the circuit court of McHenry County is affirmed as to defendant Rittmueller and reversed as to defendant Obenauf.

Affirmed in part; reversed in part.

REINHARD and VAN DEUSEN, JJ., concur.