**Blodgett Supply Co., Inc. and S.P.L. Associates, Inc. v.
P.F. Jurgs and Company, Webster S. Thompson,
Jonathan K. Woods, Robert L. Morse, David D.
Patrick and Frederick M. Reed**

[617 A.2d 123]

No. 90-017

Present: **Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 17, 1992

Motions for Reargument Denied September 15, 1992

*John B. Kassel* and *David W. M. Conard* of *Miller, Eggleston & Rosenberg, Ltd.*, Burlington, for Plaintiffs-Appellants.

*Michael B. Clapp* and *Frederic S. Lane, III*, Law Clerk (On the Brief), of *Dinse, Erdmann & Clapp*, Burlington, for Defendants-Appellees.

**Johnson, J.** Buyer sued the sellers of Blodgett Supply Co., Inc. for breach of warranties in the 1986 purchase and sale agreement, and the company sued its former accounting firm for negligence and breach of contract. Both actions arose from an accounting error that resulted in additional tax liability for the company for the years 1983 and 1984. The trial court dismissed the action against the sellers and entered judgment

against the accountants for costs incurred in filing an amended tax return, but denied relief for consequential damages against the firm. We reverse.

Five individual owners of the stock of Blodgett, a plumbing and heating distribution company in Burlington, sold the company to a corporation controlled by Samuel Levin, S.P.L. Associates, Inc. (SPL), in October 1986. The company's accounting firm prior to the sale was P.F. Jurgs and Company. Jurgs erred in preparing the company's tax returns for 1983 and 1984, resulting in the company's payment in 1987—after its sale to SPL—of $92,306 in additional taxes, penalties, and interest for those two years.

The errors by Jurgs arose in computing the company's LIFO reserves in preparing its federal and state income tax returns for 1983 and 1984. LIFO, which stands for "last in, first out," is a method of inventory accounting. The purpose of LIFO is to reduce income on which taxes must be paid. LIFO allows a company to match the cost of the most recently purchased inventory against current revenues, thereby reducing taxable profits and making more money available to buy goods. LIFO has been described as "a flow-of-costs approach to inventory accounting rather than a flow-of-goods approach." Note, *An Examination of Some Considerations Relating to the Adoption and Use of the Last-in, First-out (LIFO) Inventory Accounting Method,* 28 Vand. L. Rev. 521, 523 (1975). It is most useful during inflationary periods, when the cost of replacement inventory is rising.

In the present case, Jurgs overstated the cost of goods "sold" for LIFO purposes. Consequently, profits for 1983 and 1984 were understated, and federal and state taxes were underpaid. Because the cost of goods sold was overstated, the value of the "remaining inventory," as reflected in the LIFO reserve account, was understated. Therefore, although the actual inventory purchased by plaintiffs did not change, its value for future tax purposes was higher than the amounts reflected on the financial statements of the company. The adjustments made to the LIFO reserve, then, increased the value of the company above the amounts represented and warranted by sellers at the closing. Jurgs's negligence and breach of contract were conceded at trial and are not at issue here.

In 1986, the company's new accountants notified Jurgs of what it believed was a computational error relating to the LIFO reserve, and thereafter the company and SPL wrote the selling shareholders and Jurgs demanding indemnification, under the purchase and sale agreement, against additional federal and state taxes due as a result of the error. Receiving no response from any party, the company filed amended federal and Vermont corporate income tax returns for the calendar years 1983 and 1984 and paid a total of $75,877 in additional taxes, interest, and penalties. The company borrowed the money to pay this sum, and the interest cost to the date of trial was $15,734. The company's accounting fees related to these events to the date of trial totalled $13,715 and legal fees totalled $25,341. The company borrowed the money to pay these fees and paid interest in the amount of $3,816 to the date of trial.

At issue in plaintiffs' case against the sellers are certain representations and warranties denominated as sections 3(F), 3(H), and 8 of the purchase and sale agreement, as follows:

Section 3

*Representations and Warranties of Sellers*

. . . .

F. *Financial Information.* The Company has delivered to the Buyer true, correct and complete copies of the Company's United States income tax returns for the years ending December 31, 1984 and 1985. Such tax returns fairly reflect in all material respects the results of operation of the company and the assets, properties and liabilities of the Company for the years stated, and the balance sheets appearing therein fairly reflect in all material respects the financial condition of the company at the dates stated. The Company has also delivered to the Buyer prior to the closing financial statements for the twelve month periods ending December 31, 1984 and 1985 and for the seven month period ending July 31, 1986 (the "Financial Statements") and interim financial statements internally generated for the period from July 31, 1986 to the month ending prior to closing (the "Interim Financial Statements"). The Financial Statements were compiled by the Company's account-

ants in accordance with generally accepted accounting principles on a basis consistent with past practices. The Financial Statements and Interim Financial Statements in all material respects present fairly the results of operations and the financial condition of the company for the years and periods stated, and fairly depict the assets, properties and liabilities of the Company as of the dates stated. . . .

. . . .

H. *Tax Matters*. The Company has filed all applicable federal, state, local, foreign and other income tax, excise tax, sales tax, use tax, import duty, gross receipts tax, franchise tax, employment and payroll related tax, property tax and all other tax returns which the company is required to file and has paid all taxes shown on such returns, and all deficiencies or other assessments of tax, interest or penalties and all estimated taxes owed by it. No penalties or other charges are, or will become, due with respect to the late filing of any such return. The federal and state income tax returns of the Company have been audited for the fiscal years set forth on Schedule 4, and all deficiencies and assessments of tax, interest or penalties made or proposed in connection therewith have been paid. . . .

. . . .

## Section 8

### *Survival of Representations and Warranties*

All of the representations, warranties, covenants and agreements of the parties made in this Agreement shall be true at Closing and shall survive the closing for a period of three (3) years and no longer, except for such representations and warranties that relate to matters of title and ownership of Shares, each of which shall survive the Closing without limitation. The Buyer Samuel E. Levin and the company have relied on such representations, warranties, covenants and agreements in connection with its purchase of the shares. Subject to the foregoing limitations, the Sellers shall indemnify and hold harmless the Buyer Samuel E. Levin and the Company from *any and all damages*, payables, deficiencies, losses, obligations, claims, debts, lia-

bilities, fees, expenses or other costs (the "Damages") that result from or arise out of any breach, default or nonperformance of any representation, warranty, covenant or agreement of the Sellers set forth in this Agreement, or the untruth or inaccuracy thereof, including, but not limited to, all statements or figures contained in any Schedules to this Agreement *to the extent the Damages, and the like exceed in the aggregate $25,000. The Sellers shall have no indemnity obligation unless and until such threshold amount of $25,000 in the aggregate is reached* . . . . (Emphasis supplied.)

Plaintiffs brought the present action in 1987, and after three days of hearings, the court concluded that the sellers had not breached any of the warranties in the purchase and sale agreement and dismissed the action against the sellers. It found that Jurgs had committed an error in preparing the company's 1983 and 1984 tax returns and entered judgment for $4,740, the cost of filing the amended returns. The court denied recovery for the penalties and interest associated with the amended returns. The plaintiffs brought this appeal.

## I.

Plaintiffs argue first that the trial court erred in concluding that the company's underpayment of taxes for 1983 and 1984 did not result in the breach of any warranties in the purchase and sale agreement. On this issue the court accepted defendants' argument that the undisclosed tax liability discovered after the sale of the company was fairly reflected on the financial statements in the form of an overstated LIFO reserve. The court concluded that while Jurgs erred in preparing the tax returns, the balance sheets nevertheless "fairly reflect[ed] in all material respects the results of operation of the Company and the assets, properties and liabilities of the company for the years stated," quoting the warranty language contained in § 3(F) of the purchase and sale agreement. The court specifically found that "[t]he balance sheets do fairly reflect such financial condition. The final condition is no worse either from a profitability standpoint or a net worth standpoint as a result of the Jurgs error."

These findings reflected defendants' contentions that the same error in computing the LIFO reserve that led to the un-

derstatement of net profits and the underpayment of taxes necessarily resulted in an understatement of the value of the company's assets, and therefore an increase in the actual net worth of the company in the amount of $134,000—a greater increase than the total amount of taxes, interest, and penalties paid by the company on its amended returns. In short, defendants contended the balance sheet increase more than offset the harm caused by the accounting error. Defendants also sought to prove that the tax liability was not truly hidden, but, in fact, was reflected in the company's financial statement, because the LIFO error resulting in the understated 1983 and 1984 income resulted in an offsetting error in the LIFO reserve. The words "LIFO reserve," defendants contended, are nearly synonymous with "tax liabilities ahead."

█ █ There was substantial and conflicting expert testimony on the question of whether the company financial statements fairly "reflect[ed] in all material respects the results of operation of the company and the assets, properties and liabilities of the company for the years stated." But the court's findings will not be disturbed merely because they are contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support the finding. See *Gokey v. Bessette*, 154 Vt. 560, 564, 580 A.2d 488, 491 (1990). In transactions involving conflicting financial testimony, "[t]he trial court has great discretion in accepting or rejecting expert testimony and such determinations should not be disturbed absent manifest error." *Anderson v. Heck*, 554 So. 2d 695, 703 (La. Ct. App. 1989) (buyer of business did not demonstrate that monthly loss was "materially adverse change" in company's financial condition); see *Spartech Corp. v. Opper*, 890 F.2d 949, 955 (7th Cir. 1989) (trial judge's finding that seller did not misrepresent the extent of company's deferred tax liability would stand as not clearly erroneous).

█ In the present case, however, we agree with plaintiffs that there was no credible evidence to support the court's finding that the warranty in § 3(F) of the agreement had not been breached. The 3(F) warranty stated that the 1984 and 1985 tax returns correctly set forth the company's tax liabilities for these two years, and all parties agree that statement was

wrong.[1] Being wrong, it plainly constituted a breach of the 3(F) warranty.

It is no answer that the balance sheets annexed to the returns reflected the error in the form of an overstated LIFO reserve, which, if properly interpreted, allowed the perspicacious analyst to understand either that the return was wrong or that, at most, payment of taxes was merely postponed. A warranty should be judged on the basis of what the purchaser, here a sophisticated purchaser, might fairly infer from its four corners, without conducting his own audit and without testing the words of the warranty against possibly conflicting statements elsewhere in the agreement. There was no evidence to support the conclusion that SPL was unreasonable in relying on the 3(F) warranty that the company's tax returns fairly reflected the results of its operations and its tax liabilities for the years in question. Even Jurgs made significant errors in the handling of the LIFO reserve account for two tax years, and charging SPL with knowledge that the warranted statement of "the liabilities of the Company for the years stated" was wrong because of related information in the statement of the LIFO reserve would render the warranty meaningless.[2]

There is no merit in the argument that the balance sheet increase resulting from the post-acquisition adjustments more than offset the outlay for taxes, interest, and penalties. Plain-

---

[1] The tax computation errors occurred in 1983 and 1984, although the warranty in the purchase and sale agreement warrants the returns of 1984 and 1985. Presumably, the LIFO reserve error made in 1983 tainted the 1984 return, and if it did not, errors were, in fact, made in 1984. This was not an issue at trial or on appeal.

[2] Plaintiffs also argue that sellers violated the warranties contained in § 3(H) of the purchase and sale agreement. The company did not fail to file "all applicable federal, state . . . income tax . . . returns which the company is required to file" and did pay all taxes *shown on such returns.* It is true that the returns were erroneous, and these errors were implicated in the breach of the 3(F) warranties, but the language of 3(H) was not violated. Similarly, "all deficiencies or other assessments of tax, interest or penalties and all estimated taxes owed by" the company as reflected on *such returns* had been paid. Finally, 3(H) warranted that "all deficiencies and assessments of tax, interest or penalties made or proposed in connection" with audits of the company had been paid, but 3(H) did not purport to speak for deficiencies, assessments, interest, or penalties not detected by audit.

tiffs paid taxes, interest, and penalties in cash. The offsetting savings, if any, would come in later years in amounts that were not determinable on the date of the acquisition and were surely not adjusted to reflect the time value of money. Thus the "enhanced balance sheet" defense went to the extent of plaintiffs' damages and not to whether there was a breach of warranty.

The trial court erroneously concluded that defendants had not violated any of the warranties in the purchase and sale agreement, and its decision must be reversed and the matter remanded to determine plaintiffs' damages, if any.

## II.

Because the trial court ruled in defendants' favor, it did not reach the issue of damages. We will consider that issue here because it will arise on remand and is integrally related to our holding on liability.

■ Damages for breach of warranties by sellers of a business should be the "'loss of the bargain'—the difference between the worth of the article as represented and that as actually delivered." *Coleco Industries, Inc. v. Berman*, 567 F.2d 569, 577 (3d Cir. 1977) (accounting errors causing underestimation of cost of pools resulted in breach of warranties of profitability). As applied to the present case, that would be the difference between the purchasers' reasonable expectations as to the worth of the company, as fairly described in the warranties, and the actual worth of the company as a result of any breach of warranties. Here, plaintiffs laid out certain amounts of cash relatively soon after purchase, on account of an undisclosed tax liability. There is no dispute as to the amount that plaintiffs paid in federal and state taxes, together with penalties and interest, on the amended returns for 1983 and 1984.[3] If those damages were minimized or eliminated by offsetting savings, the burden of demonstrating that was on defendants.[4] The

---

[3] Defendants do not appear to dispute the amounts expended by plaintiffs for attorney and accounting fees and the cost of borrowing to pay sums owed on the returns. But defendants do not concede that such expenditures were damages contemplated by the purchase and sale agreement.

[4] Plaintiffs moved at trial to bar testimony on defendants' behalf relating to

sellers presented expert testimony explaining that the underpayment of taxes for 1983 and 1984 did not prejudice plaintiffs, because the amount of the underpayment, $75,877, was less than the increase in the actual net worth of the company of $134,000, and counsel argued on this basis that SPL got more dollar value than it bargained for in the company purchase.

But there was no testimony that the $134,000 that was added to the value of assets in the amended corporate tax returns put plaintiffs in the financial position they would have been in had the 1983 and 1984 taxes been timely and accurately paid—hence precluding any "loss of the bargain." To the contrary, the testimony was clear that actual value of the company's assets did not change upon discovering the Jurgs error. The company could not raise its prices to customers on the basis of the adjustments in the LIFO reserve.

The adjustments to the reserve account in the amended returns were nevertheless likely to be of some value to the company, since they would tend to lessen future tax liability by increasing the stated cost of goods sold and lowering net profits. Again, the trial court did not review the record on the issue of damages, and we cannot determine whether, or to what extent, defendants might demonstrate offsets to some or all of plaintiffs' damages. Those amounts may be determinable on the present record or may require further testimony and additional documentary evidence, within the court's discretion upon remand.

### III.

The trial court concluded that because there had been no breach of any warranty or representation, there was "no need to apply the $25,000 'deductible'" found in § 8 of the purchase and sale agreement. In light of our holding, § 8 is an integral part of the damages issue. Consequently, we will consider the questions raised by plaintiffs relating to § 8 "in order to con-

---

tax benefits accruing after filing of the amended returns and offsetting some or all of the amounts paid with the amended returns. Plaintiffs argued that the offsets were barred under the collateral source rule. See *Coty v. Ramsey Associates, Inc.*, 149 Vt. 451, 462–63, 546 A.2d 196, 204 (1988). The motion was denied, and plaintiffs have not raised the collateral source rule issue in this appeal.

serve judicial resources and avoid an unnecessary duplication of effort." *Pfeil v. Rutland District Court*, 147 Vt. 305, 308, 515 A.2d 1052, 1055 (1986).

■ We hold that § 8 of the agreement is a threshold, not a deductible. Two clauses in the section refer to a $25,000 amount. The first implies that a deductible is intended, in that it uses the phrase *"to the extent* the Damages, and the like exceed in the aggregate $25,000." But the next sentence uses the word "threshold" and clearly implies that $25,000 is the amount of damages that must be reached for any recovery, but that once that amount is reached, "any and all" damages may be recovered. This construction is most sensible in reconciling the two conflicting clauses. Any other construction would render the second clause meaningless, and it must be assumed that the parties included it for a reason. *Vermont State Colleges Faculty Federation v. Vermont State Colleges*, 141 Vt. 138, 143, 446 A.2d 347, 349 (1982) (contract must be construed, if possible, to give meaning to all its provisions).

## IV.

Finally, the company appeals from the court's limited judgment against Jurgs for the cost of filing an amended tax return due to Jurgs's admitted error in the computation of the company's 1983 and 1984 income tax returns. The court found that Jurgs's errors did not constitute bad faith conduct and properly denied attorney's fees.

The court did not explain why it denied judgment against Jurgs for the amount of penalties paid by the company to the State of Vermont in connection with the late returns. Defendant Jurgs does not argue that penalties were not reasonably foreseeable, and hence, compensable. It argues that the company failed to present evidence of the penalty payment, because the entry "Penalties and Interest" in the company's proposed findings of fact was the same amount that witness Levin had testified was interest alone. Since the trial court did not rule on this question and the question of damages will be before the court on remand, the trial court must weigh the evidence as to the payment of a penalty to Vermont together with the other damage issues.

## V.

■ Damages should also include reasonable fees paid by plaintiffs in accordance with the covenants in the purchase and sale agreements. Section 8 of the purchase and sale agreement provided for payment of "fees, expenses or other costs . . . that result from or arise out of any breach, default or nonperformance of any representation, warranty, covenant or agreement of the Sellers set forth in this Agreement." Plaintiffs have asked for all of their considerable legal and other fees to be borne by defendants, but they have prevailed on only one of their warranty claims. More importantly, they have not prevailed on their theory of damages, which focused exclusively on the gross outlays resulting from breach of warranty, rejecting the notion that any later savings realized from the error should be offset against the costs of the breach. It is clear from the lengthy trial, voluminous record, and the briefs before this Court that significant attorneys' time was expended on damages issues on which plaintiffs did not prevail. We cannot say on the present record to what degree plaintiffs' erroneous position on damages contributed to the length and complexity of the trial. The trial court should compute the fee award on the basis of time spent on issues on which plaintiffs prevailed. *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 542–43 (Minn. 1986) (in action for breach of warranty in sale of company, successful plaintiffs' fee award under state statute should reflect federal fee award provisions for partially successful claim).

*The judgment is reversed and the matter remanded for reconsideration consistent with this opinion.*