# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-4029, 01-4073, 02-1071, and 02-1171

VIGORTONE AG PRODUCTS, INC., formerly
  known as PROVIMI ACQUISITION CORPORATION,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

PM AG PRODUCTS, INC.,

*Defendant-Appellant, Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 7049—Harry D. Leinenweber, *Judge.*

ARGUED JUNE 7, 2002—DECIDED NOVEMBER 6, 2002

Before BAUER, POSNER, and RIPPLE, *Circuit Judges.*

POSNER, *Circuit Judge.* This diversity suit charges fraud and breach of contract in the sale of a business called Vigortone, a manufacturer of "swine premix," which is a vitamin- and mineral-enriched food supplement for pigs. The fraud claim is governed by Illinois law; the contract claim is governed by Delaware law by virtue of a choice of law provision in the contract.

Vigortone was a subsidiary of an animal-nutrition business called PM AG Products, which sold Vigortone to Provimi, a large manufacturer of agricultural products, including animal food products, for $39.5 million. PM is the defendant. The plaintiff, Vigortone Ag Products, is a Provimi subsidiary that was created to purchase Vigortone. To avoid confusion, we'll call the plaintiff Provimi.

Pigs are raised in stages. Piglets are kept at the sow farm until they weigh 12 pounds, and then they are weaned and shipped to "nurseries." When, having graduated from "weaners" to "feeders," they reach 50 pounds, they are transferred from the nursery to a finishing barn and raised to market weight. Vigortone decided to buy weaners and feeders and resell them to nurseries and other pig growers in the hope that both the sellers of the pigs to Vigortone and the buyers of the pigs from Vigortone would buy their swine premix from Vigortone. This kind of promotion is apparently common in the animal-feed business. By the time Vigortone was sold to Provimi in April of 1998, it had signed seven contracts with pig farms to buy a total of 3 million pigs over a 10-year period at specified prices. But it had made no contracts to sell the pigs, and so it bore the risk of a change in the market price of the animals. That risk passed to Provimi with the seven contracts. The price of pigs fell and as a result Provimi, according to its expert witness, lost $16 or $17 million. Even the lower figure is questionable, because it is based on a price drop most of which occurred months after the closing and therefore after Provimi discovered the contracts and could have hedged against any further decline; for it acknowledges having discovered its exposure "shortly after the closing."

Provimi claims that PM fooled it into thinking that Vigortone had offsetting sale contracts for all the pigs and

so bore no risk of price changes in the pig market. The jury agreed and awarded Provimi $12 million in damages for fraud and another $3 million in damages for breach of contract. The district judge thought the awards duplicative and so cut out the $3 million. PM appeals from the judgment against it. Provimi cross-appeals, seeking restoration of the $3 million in breach of contract damages and also additional attorney's fees pursuant to a contract clause that entitles a party that proves a breach to his attorney's fees. The judge awarded Provimi $1 million in attorney's fees in the belief that that was the most that would be consistent with the jury's award of $3 million in contract damages. Provimi argues that the fee award should be more and PM that it should be zero because, PM argues, Provimi failed to prove a breach of contract.

There was clear and convincing evidence (required under Illinois law to prove fraud, *Ray v. Winter*, 367 N.E.2d 678, 682 (Ill. 1977); *Niemoth v. Kohls*, 524 N.E.2d 1085, 1094 (Ill. App. 1988); *Ronan v. Rittmueller*, 434 N.E.2d 38, 42 (Ill. App. 1982)) that during the contract negotiations with Provimi, PM made false statements about the market risk that Vigortone had incurred by buying pigs without entering into offsetting sale contracts in order to hedge against fluctuations in the price of pigs over the life of the pig-purchase contracts. PM said the contracts were part of a pig "pass-through" or pig "placement" program, terms understood in the industry to refer to the brokering (or equivalent) of pigs as a promotional device that does not involve assuming any risk of fluctuations in animal prices. PM even assured Provimi that Vigortone's pass-through program involved absolutely no market risk.

These were oral assurances made before the contract was signed, and PM argues that the integration clause in the contract precludes Provimi's relying on such assur-

ances to establish fraud. The general rule is to the contrary. *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997); *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 598-99 (N.Y. 1959); *Lewelling v. Farmers Ins. of Columbus, Inc.*, 879 F.2d 212, 216 (6th Cir. 1989); *UAW-GM Human Resource Center v. KSL Recreation Corp.*, 579 N.W.2d 411, 418 (Mich. App. 1998); E. Allan Farnsworth, *Contracts* § 7.4, pp. 442-43 (3d ed. 1999). By virtue of the parol evidence rule, an integration clause prevents a party to a contract from basing a claim of breach of contract on agreements or understandings, whether oral or written, that the parties had reached during the negotiations that eventuated in the signing of a contract but that they had not written into the contract itself. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993); *International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 730-31 (7th Cir. 1999); *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1545-46 (7th Cir. 1990); *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1373 (7th Cir. 1990). But fraud is a tort, and the parol evidence rule is not a doctrine of tort law and so an integration clause does not bar a claim of fraud based on statements not contained in the contract. Doctrine aside, all an integration clause does is limit the evidence available to the parties should a dispute arise over the meaning of the contract. It has nothing to do with whether the contract was induced, or its price jacked up, by fraud.

That is just the general rule, though, and it may not be the rule in Illinois. PM cites *Barille v. Sears Roebuck & Co.*, 682 N.E.2d 118 (Ill. App. 1997), which holds that an integration clause does extinguish a claim of fraud based on precontractual misrepresentations. But *Barille* contains no discussion of the issue—just a conclusion—and no reference to the general rule. Moreover, another case in Illinois' intermediate appellate court is directly contrary to

*Barille*, though also unreasoned. See *Salkeld v. V.R. Business Brokers*, 548 N.E.2d 1151, 1157-58 (Ill. App. 1989). There is a dictum to the same effect in another case in the intermediate appellate court. *Pecora v. Szabo*, 418 N.E.2d 431, 435 (Ill. App. 1981).

When state law on a question is unclear, which is surely the proper characterization here, the best guess is that the state's highest court, should it ever be presented with the issues, will line up with the majority of the states. *Wammock v. Celotex Corp.*, 835 F.2d 818, 820 (11th Cir. 1988); see *Amherst Sportswear Co. v. McManus*, 876 F.2d 1045, 1048 (1st Cir. 1989); *Adkinson v. International Harvester Co.*, 975 F.2d 208, 215 (5th Cir. 1992); cf. *Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.*, 260 F.3d 54, 65 (1st Cir. 2001). And the majority rule is that an integration clause does not bar a fraud claim.

One consequence of the rule is that parties to contracts who do want to head off the possibility of a fraud suit will sometimes insert a "no-reliance" clause into their contract, stating that neither party has relied on any representations made by the other. *Rissman v. Rissman*, 213 F.3d 381, 383-84 (7th Cir. 2000); *First Financial Federal Savings & Loan Ass'n v. E.F. Hutton Mortgage Corp.*, 834 F.2d 685, 687 (8th Cir. 1987); *Landale Enterprises, Inc. v. Berry*, 676 F.2d 506, 507-08 (11th Cir. 1982) (per curiam); *Danann Realty Corp. v. Harris, supra*, 157 N.E.2d at 599, 600; see also *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 416-17 (1st Cir. 1989). Since reliance is an element of fraud, the clause, if upheld—and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises—precludes a fraud suit, as the cases we have just cited make clear. So PM describes what we have been calling the integration clause as a no-reliance clause. But it is not. It is a standard integration clause. It

contains no reference to reliance. What is more, another provision in the contract, captioned "Disclosure," states that "To the best knowledge of [PM], there is no fact which adversely affects or in the future is likely to adversely affect the Purchased Assets or the Business in any material respect which has not been set forth or referred to in this Agreement or the Schedules hereto." That sounds like a warranty and one PM violated since it knew that the enormous market risk which Vigortone had assumed and was being transferred to Provimi might affect Vigortone's business adversely, yet it failed to disclose the risk in the contract or any of its riders. More to the point, since at the moment we're discussing the fraud charge rather than the breach of contract charge, the existence of such a warranty makes it implausible to suppose that the integration clause was meant to reach representations designed actively to conceal the existence of an undisclosed fact likely to harm Vigortone.

But we must also consider whether Provimi's reliance on PM's representations concerning the absence of market risk was "justifiable," as required for a suit for fraud to succeed. *Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co.*, 499 N.E.2d 1319, 1323 (Ill. 1986). The term "justifiable reliance" is pretty vague. In an effort to clarify it for the jury, the district judge instructed that reliance is unjustifiable only if reckless, and he further explained that what "reckless" means in this context is, as we said in one of our cases interpreting Illinois fraud law, not that the victim was careless but, worse, that he closed his eyes to a known or obvious risk. *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995). As we put it in another fraud case governed by Illinois law, *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990), "the potential victim of a fraud may not ignore a manifest danger." See also *Melko v. Dionisio*, 580 N.E.2d 586,

592 (Ill. App. 1991), citing *AMPAT/Midwest* approvingly; *Schmidt v. Landfield*, 169 N.E.2d 229, 231-32 (Ill. 1960); *Costello v. Liberty Mutual Ins. Co.*, 348 N.E.2d 254, 257 (Ill. App. 1976); *Mayer v. Spanel International Ltd.*, *supra*, 51 F.3d at 675-76 (Illinois law); *Dexter Corp. v. Whittaker Corp.*, 926 F.2d 617, 620 (7th Cir. 1991) (ditto) ("an ostrich can hardly be said to *rely* on there being no danger in the vicinity"). This incidentally is the general rule, e.g., 2 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, *The Law of Torts* § 7.8, pp. 423-24 (2d ed. 1986), not anything peculiar to Illinois.

Although the jury found that Provimi's reliance had not been reckless, this finding has so little basis in the evidence that, even though appellate review of jury verdicts is highly deferential, *Reynolds v. City of Chicago*, 296 F.3d 524, 526-27 (7th Cir. 2002), we are compelled to reverse. Six of Vigortone's seven contracts for the purchase of pigs were actually shown to a lawyer who was doing "due diligence" for Provimi before the purchase of Vigortone was signed and who summarized the basic provisions of some of the contracts in a memo to the higher executives of the company; but no contracts for the sale of the pigs, or any other documents indicating that the pig-purchase contracts had been hedged, were shown to Provimi or its agent, since they did not exist. Provimi is charged with its agent's knowledge acquired in the course of the engagement, *Booker v. Booker*, 70 N.E. 709, 714 (Ill. 1904); *Metropolitan Sanitary District of Greater Chicago v. Anthony Pontarelli & Sons, Inc.*, 288 N.E.2d 905, 912 (Ill. App. 1972) (per curiam); *New York Marine & General Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001).

Anyway Provimi *had* to know there were pig-purchase contracts because it had been told about the pig place-

ment program. The absence of any indication of offsetting or hedging contracts was a gigantic warning flag unaccountably ignored. Provimi, a huge commercial enterprise engaged in the same line of business as the company it was acquiring (it brags in its Web site that it is "the world leader in animal nutrition solutions"), knew it was about to become the proud owner of 250,000 pigs, a number that would eventually swell to 3 million. Its able lawyer assured us at the argument that his client had been assiduous to avoid *ever* owning animals, not wanting to bear the risk of fluctuations in their prices. All of a sudden it found itself the current or future owner of an *immense* number of pigs. It must have known that the ownership of animals creates a market risk unless the purchase contracts are hedged. No document was requested by or shown to Provimi indicating that any of the contracts had been hedged. Provimi itself stated, in its statement of uncontested facts in the district court, that PM had "prepared a 'Data Room' containing information about Old Vigortone, which it made available to the Provimi representatives at the meeting. The index to the materials in the Data Room referred to the 'F/Y 1998 Pig Source Agreements.' The pig-purchase contracts were not in the Data Room." Precisely: and their absence should have sent Provimi's negotiating team hunting for offsetting sales contracts.

As we explained in *AMPAT*, the reason or at least a reason for barring the reckless fraud plaintiff from obtaining relief is that when a person or firm, especially (we add) a large, sophisticated commercial enterprise with relevant experience, closes its eyes to a manifest danger, suspicion arises that it wasn't actually fooled by the false representations of which it is complaining. 896 F.2d at 1042. Maybe Provimi thought that pig prices would rise and that therefore it would make money by bearing market risk; or may-

be it thought it could readily hedge the contracts after it bought Vigortone; or maybe it thought Vigortone such a bargain at $39.5 million that it was willing to assume some animal-market risk. (The fact that it did not hedge supports the first inference, that it thought the price of pigs would rise.) These are just speculations. But they are considerably more plausible than Provimi's argument that despite the absence of documentary evidence which it would have received from PM had such evidence existed, it believed that the 3 million pigs that Vigortone had committed to buy had already been resold.

Our conclusion owes nothing, however, to PM's argument that the district judge improperly excluded admissions by Provimi at an arbitration hearing that preceded the trial. The contract for the sale of Vigortone to Provimi provided for arbitration if after the closing either party believed that an adjustment in the purchase price was necessary. Provimi did of course believe that, for it admits that it was soon after the contract closed that it discovered that the pig-purchase contracts were not hedged, and so an arbitration was conducted (resulting however in a net adjustment in favor of PM). But the arbitrator insisted and the parties agreed that "neither Party shall introduce as evidence in any subsequent litigation between the Parties all or any part of any submissions prepared by the other Party solely for the arbitration proceeding." The arbitration clause was explicit that any arbitration, which was to be limited to accounting issues, would have no preclusive effect on a suit for breach of contract. The evidence submitted by Provimi in the arbitration included a statement by an accounting firm it had retained that during the "due diligence" phase of the contract negotiations, Provimi had made "repeated inquiries" of PM "regarding the economic impact of the [swine-purchase] commitments," that PM had insisted "that the arrange-

ments were 'pass-through' in nature with no negative or positive economic impact," but that "*because of the economic uncertainty associated with the Pig Pass-Through Program and the swine purchase commitments*, as well as the lack of audited historical financial information, the Buyer specifically negotiated a provision for the adjustment of the Purchase Price based on the net assets and liabilities of the Business as of the Closing Date" (emphasis added). This could be construed as an admission that Provimi suspected that Vigortone had failed to hedge its pig-purchase contracts adequately (or at all) and so would bolster the inference that Provimi ignored a known danger.

PM argues that the presumption that Rule 402 of the Federal Rules of Evidence creates in favor of the admission of relevant evidence should override the parties' agreement not to use evidence submitted in the arbitration in any future litigation. We do not agree with this position, for which there is no support in case law or elsewhere— certainly not in Rule 402, which does not purport to alter the many limitations on the admissibility of relevant evidence. The beauty of arbitration is that it allows disputants to design their own method of dispute resolution. In this case they wanted a nonpreclusive form of arbitration, one that would not prevent a suit for breach of contract, and it made perfectly good sense therefore for them to agree to bar the use of the evidence presented in the arbitration in such a suit. Otherwise the arbitration would become as cumbersome as a trial, with either party fearful that any slip in its evidentiary submissions would come back to haunt it in litigation. The analogy to the inadmissibility of "conduct or statements made in compromise negotiations," Fed. R. Evid. 408; see *Winchester Packaging, Inc. v. Mobil Chemical Co.*, 14 F.3d 316, 320 (7th Cir. 1994), is apparent.

So the fraud verdict must be thrown out; PM is entitled to judgment as a matter of law on that aspect of the case. This leaves the breach of contract claim. Remember that the district judge vacated the jury's $3 million award of damages for breach of contract because he thought it duplicated the fraud award. Provimi argues that he erred in doing this because the $3 million may well have been the jury's estimation of Provimi's past and anticipated future losses on the seventh pig-purchase contract, the one PM had not disclosed to Provimi. The jury might have thought, Provimi argues, that the failure to disclose—a clear breach of contract—had been inadvertent and therefore not fraudulent. This makes no sense. The theory of fraud presented to and apparently accepted by the jury was that PM had concealed the existence of *any* market risk in its pig pass-through program. There was no rational basis for supposing that PM might have wanted to conceal the market risk created by the six contracts that it showed Provimi but not the market risk created by the seventh contract.

We have no idea what the jury was thinking when it awarded $3 million for breach of contract; no path connects the evidence bearing on the breach of contract claim to that number or a number remotely like it. We are puzzled, therefore, why the judge thought that award the proper basis for assessing attorney's fees, although this is not a puzzle that we'll have to unravel on this appeal, since any award of attorney's fees must abide the new trial that we are ordering—a trial, unfortunately, that cannot be limited to damages, because we do not know what provisions of the contract the jury found had been violated. PM denies that there was *any* breach. This is clearly wrong with respect to the failure to disclose the seventh pig-purchase agreement. The contract required PM to furnish Provimi a complete list of Vigortone's contracts—

PM does not argue otherwise. Yet even with respect to that breach, it is far from certain that Provimi suffered any damages. We know that the six contracts that were disclosed did not cause Provimi to back out of the deal or insist on a change in its terms; how likely is it that disclosure of the seventh would have had any effect?

PM may, however, have violated other provisions of the contract as well, and with greater legal consequences. Remember the warranty that to the best of PM's knowledge "there is no fact which adversely affects or in the future is likely to adversely affect the Purchased Assets or the Business in any material respect which has not been set forth or referred to in this Agreement or the Schedules hereto"? As we pointed out earlier, the fact, which was not disclosed, that PM had failed to hedge Vigortone's pig-purchase contracts may well have been a fact "which adversely affects or in the future is likely to adversely affect the Purchased Assets or the Business." If the jury on remand determines that this warranty (or some other warranty in the contract) was breached, it will have to assess damages anew.

A warranty is a kind of insurance, entitling the beneficiary of the warranty to be held harmless against the event insured against. *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999); *Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.); *Council of Dorset Condominium Apartments v. Dorset Apartments,* Civ. A. No. 90C-10-269, 1992 WL 240365, at *3 (Del. Super. Sept. 24, 1992). In the case of the sale of a business, a breach of warranty entitles the victim of the breach, by way of damages, to "the difference between the purchasers' reasonable expectations as to the worth of the company, as fairly described in the warranties, and the actual worth of the company as a result of any breach of warranties."

*Blodgett Supply Co. v. P.F. Jurgs & Co.*, 617 A.2d 123, 127 (Vt. 1992); see also *Phillips v. Ripley & Fletcher Co.*, 541 A.2d 946, 950 (Me. 1988). That is what the plaintiff's expert purported to estimate, though imperfectly as we noted at the outset. And we reject PM's argument that against whatever unavoidable loss Provimi incurred must be set off the profits that Provimi made by virtue of the additional sales of swine premix that the pig-purchase contracts generated. Those profits would have been obtained even if the contracts had been perfectly hedged. They were not a benefit conferred on Provimi by PM's breach.

It appears, however, that Provimi failed to mitigate its damages. It discovered its exposure to a change in pig prices shortly after the closing and could at that time have averted most of the loss that ensued by prompt hedging of the pig-purchase contracts that it had inherited. It is not entitled to damages that it could readily have avoided. *Cates v. Morgan Portable Building Corp.*, 780 F.2d 683, 688-89 (7th Cir. 1985); *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 921-22 (11th Cir. 1987). The briefs do not discuss this point, however, and maybe it has been forfeited; this is a matter that can be straightened out on remand.

If as we have determined Provimi was reckless in failing to discover that the pig-purchase contracts were not hedged, it may seem anomalous that it should be able to obtain contract damages for PM's failure to hedge. The general rule, however, is that a party to a contract can enforce an express warranty even if he should believe or even does believe that the mishap warranted against will occur. Suppose one buys an automobile and the contract of sale contains a warranty that it is a new car. The condition of the car is such that the buyer is sure it's a used car, and a few days after the purchase he discovers

proof that he was right. He can still enforce the warranty. *CBS Inc. v. Ziff-Davis Publishing Co.*, 553 N.E.2d 997, 1000-01 (N.Y. 1990); *Indeck North American Power Fund, L.P. v. Norweb plc*, 735 N.E.2d 649, 658-59 (Ill. App. 2000). This is an application of the principle emphasized by Holmes that it is possible to make an enforceable promise to do the impossible, since the practical meaning of the duty imposed by contract is that the promisor must either perform or pay damages if he fails to perform. Oliver Wendell Holmes, Jr., *The Common Law* 300-02 (1881); Holmes, "The Path of the Law," 10 *Harv. L. Rev.* 457, 462 (1897). It is a general characteristic of insurance that the promisor has no control over the event that, should it come to pass, will trigger his duty to pay.

*CBS* and *Indeck* state the general rule, but Delaware, whose law controls the contract claim, has been said to require that the party seeking to enforce the warranty have relied on its being truthful. See *Kelly v. McKesson HBOC, Inc.*, No. Civ. A. 99C-09-265WCC, 2002 WL 88939, at *8-9 (Del. Super. Jan. 17, 2002); *Middleby Corp. v. Hussman Corp.*, No. 90 C 2744, 1992 WL 220922, at *6 (N.D. Ill. Aug. 27, 1992) (discussing Delaware law). The *fons et origens* of Delaware's unorthodox position is an old case called *Loper v. Lingo*, 97 Atl. 585, 586 (Del. Super. 1916), decided at a time when breach of warranty was considered a tort, not, as in the modern cases, a breach of contract. The repetition of *Loper* in later cases, none by Delaware's highest court has been, we suggest with all due respect, unthinking. We greatly doubt that Delaware's highest court would follow *Loper* today.

REVERSED AND REMANDED.

A true Copy:

     Teste:

                              _____

                              *Clerk of the United States Court of*
                               *Appeals for the Seventh Circuit*