Opinion issued October 4, 2007

: 

 





In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00681-CV






ORION REFINING CORPORATION AND JOHN STANLEY, Appellants


V.


UOP, A GENERAL PARTNERSHIP; UOP LLC; EM SECTOR HOLDINGS,
INC; AND CATALYSTS, ADSORBENTS AND PROCESS SYSTEMS, INC.,
Appellees






On Appeal from the 129th District Court

Harris County, Texas

Trial Court Cause No. 2002-16080






O P I N I O N

 Appellant, Orion Refining Corporation, challenges the summary judgment
rendered in favor of appellees, UOP, a General Partnership; UOP, LLC; and
Catalysts, Adsorbents and Process Systems, Inc. (collectively, UOP) on Orion's
breach-of-contract and extra-contractual claims. (1) Orion's first issue presents a broad
challenge to the summary judgment that dismissed all of Orion's claims; Orion's fifth
issue asks whether Orion's summary judgment evidence raises material questions of
fact on elements of Orion's claims. In addition to these global issues, Orion presents
three specific challenges, as follows: (1) whether UOP conclusively defeated Orion's
extra-contractual claims under Illinois law, (2) whether Orion stated a viable action
for common-law fraud under Illinois law or under the Illinois Consumer Fraud and
Deceptive Business Practices Act, (2) and (3) whether Orion has viable claims for
breach of contract and negligence under Illinois law. Appellant John Stanley presents
a single issue contending that the trial court abused its discretion by striking Stanley's
petition to intervene in Orion's action. We affirm.

Facts and Procedural History


A. Background

 UOP obtained a licensing agreement from the BAR-CO Processes Joint
Venture (BARCO) in 1994. By this agreement, UOP acquired rights to use
BARCO's "patents and technical information relating to the MSCC process," (3) as an
improvement over existing catalytic-conversion processes used in oil refining. It is
undisputed that the MSCC process was newly patented technology. 

 UOP and Orion's predecessor-in-interest, TransAmerican Refining Corporation
(TransAmerican), executed an agreement, described as a license, (4) engineering, and
guarantee agreement (the agreement, or the TransAmerican-UOP agreement), which
is dated May 1, 1995 and incorporates six attachments. The agreement recites that
UOP and TransAmerican exchanged mutual rights and responsibilities concerning
TransAmerican's use of the "MSCC process" (5) at a refinery in Louisiana, where
TransAmerican planned to replace the refinery's existing catalytic converter with one
using the MSCC process. Stanley signed the agreement in a representative capacity,
as chairman and chief executive officer of TransAmerican. 

 The agreement recites background information explaining that TransAmerican
solicited bids relating to the MSCC process from UOP for the "detailed design,
procurement, construction, operation and maintenance" of an existing TransAmerican
unit at Norco, Louisiana. (6) TransAmerican sought to "revamp and convert" the Norco
unit to an "MSCC Process unit." (7) The agreement specifies that TransAmerican
consulted UOP to "provide engineering and technical advisor services" relating to the
MSCC process for the Norco unit, (8) but that "design, procurement, construction,
operation, and maintenance" of the unit remained with TransAmerican. 
TransAmerican paid UOP $3.5 million for the rights conferred by the agreement.

 UOP had previously extended an MSCC license to only one other facility, a
New Jersey refinery known as CEPOC. According to Orion's pleadings, although
only three refineries in the world use the MSCC process, the Norco unit is one-of-a
kind among these three. Orion became the owner of the Norco unit in 1998, when
TransAmerican was forced to sell the unit to creditors who financed the
reconstruction and foreclosed. The shareholders of Orion are TransAmerican's
former creditors. The record reflects that Orion's purchase was an asset transfer of
TransAmerican's property, including TransAmerican's rights under the agreement
with UOP. (9) 

 Construction of the Norco unit was not yet complete when TransAmerican
transferred its assets to Orion in 1998, and TransAmerican did not even begin
construction until 1997, over two years after the TransAmerican-UOP agreement was
executed. Construction was halted in 1998 due to TransAmerican's financial
difficulties. After taking over TransAmerican's assets in 1998, Orion paid UOP
$135,000 to conduct a study to determine whether to continue constructing the Norco
unit. (10) Operation of the unit did not occur until June 2000, when the unit was
completed. Problems developed after startup, however, and required several months
of shutdowns and expenses for repairs. 

B. Key Terms of the Agreement

 Article 7 of the agreement between TransAmerican and UOP addresses
"Responsibility and Liability" of both TransAmerican and UOP. Pursuant to article
7.1, UOP warranted that the services to be provided under the agreement would be
"performed according to accepted engineering practices." (11) As article 7.1 further
provided, "the exclusive remedy" for breach of "this warranty"--specifically, the
warranty to perform according to accepted engineering practices--UOP would
"reperform," at its own expense, "that portion of the services for which a breach ha[d]
occurred." "Any claim for breach of this warranty," however, had to "be made in
writing within one year after the Start of Initial Operation, (12) but in no event later than
three years after the date of this agreement." 

 With respect to performance, article 7.2 of the agreement states that the
"guarantees relating to the performance of the Unit are specified in Attachment V," (13)
and further states, "Except as specified in article 7 and in Attachment V, UOP
MAKES NO WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED." 
(Emphasis and upper case in original.) 

 Attachment V specifies the details of UOP's performance guarantee, the
performance tests contemplated, and UOP's responsibility. Article 1, paragraph 1.1
of Attachment V guaranteed that "during a Performance Test (14) conducted according
to 2.1," the unit would meet rates, as specified in paragraph 1.1(a)-(d) for processing,
minimum percentage of gasoline yield and conversion, and maximum consumption
of catalyst. (15) Article 2.1 of Attachment V imposed six "Conditions" on the article 1.1
guarantee. Pursuant to one of these conditions, however, as stated in article 1.2 and
its subsection (b), the guarantee would apply "only if . . . the Start of Initial Operation
occurs within three years after the start of this agreement." (16) 

 Article 7.3 of the agreement qualified that TransAmerican would "at all times
remain solely responsible for the detailed design, procurement, construction[,] and
maintenance of the Unit." Pursuant to article 7.4, UOP's liability for bodily injury
or property damage arising out of its services was restricted to damages "caused by
the willful misconduct or negligence of UOP." And as article 7.4 further specified, 

 IN NO EVENT [WOULD] UOP BE LIABLE FOR SPECIAL,
CONSEQUENTIAL, OR INDIRECT DAMAGES, INCLUDING,
BUT NOT LIMITED TO, LOSS OF PROFITS OR LOSS OF USE. 
This limitation shall apply whether the cause of action relates to this
agreement or arises out of the technology, goods[,] or services provided
by UOP under this agreement, and shall apply regardless of the legal
theory (tort or contract) upon which the action is based.


(Emphasis and upper case in original.) In addition, article 7.7 expressly limited
"UOP's aggregate liability" under the agreement to $1.4 million, "except for UOP's
expenses (if any) associated with any breach of the warranty in Article 7.1,"
specifically, the engineering warranty to perform according to accepted engineering
practices. 

 Finally, pursuant to Article 13, the May 1, 1995 agreement "embodie[d] the
entire understanding between the parties relating to the subject of th[e] agreement"; 
there were "no related prior representations or agreements." 

D. Procedural History

 Orion sued UOP in March 2002. Orion's live pleadings allege that UOP (1)
fraudulently misrepresented the MSCC process by knowingly, and with reckless
disregard for the truth, concealing material information that, if provided, would have
precluded the agreement; (2) fraudulently induced the agreement, which fraud was
not excused by the agreement's "NO WARRANTIES OR GUARANTEES,
EXPRESS OR IMPLIED" provision (emphasis and upper case in original); (3)
owed UOP attorney's fees under the Illinois deceptive trade practices act; (4) was
negligent; (5) was equitably estopped from denying its liability; (6) negligently
misrepresented the MSCC process; (7) breached the agreement; and (8) violated the
Illinois Consumer Fraud Act. 

 Soon after Orion filed its original petition, UOP filed a unified pleading that
combined special exceptions and a motion for traditional summary judgment. UOP
based its motion for summary judgment solely on the agreement. Orion then
conducted extensive discovery and filed several responses, to which UOP filed
replies. Orion amended its pleadings three times. The trial court conducted three oral
hearings that are not part of the record on appeal. 

 After an initial interlocutory summary judgment rendered in UOP's favor on
all of Orion's claims except one, for which the trial court sustained UOP's special
exceptions, the trial court later rendered a final summary judgment in favor of UOP
and granted UOP's motion to strike the petition by which Stanley sought to intervene
in the lawsuit. The trial court did not state the grounds on which it rendered summary
judgment, but the record reflects that the trial court took judicial notice of Illinois
case law, in response to Orion's requests. Because the summary-judgment record
shows that the parties relied on Illinois law, we assume, but do not decide, that
Illinois law controls. (17) 

Summary Judgment against Orion


A. Standard of Review--in General

 We review summary judgments de novo, as questions of law. Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). Because the trial court
did not state the grounds on which it rendered summary judgment, we may affirm the
ruling on any meritorious theory on which UOP relied to defeat Orion's claims. See
Joe v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 156-57 (Tex. 2004). 
Summary judgment is proper only if UOP, as movant, established the absence of any
genuine issue of material fact and that it was entitled to judgment as a matter of law. 
See Rhône-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 222 (Tex. 1999). To prevail by
traditional summary judgment against Orion's causes of action, UOP had to defeat
at least one essential element of each of them. See Science Spectrum, Inc. v.
Martinez, 941 S.W.2d 910, 911 (Tex. 1997). 

 Once the movant establishes that it is entitled to summary judgment, the
nonmovant can defeat that showing only by producing evidence that raises a genuine
issue of material fact. Tex. R. Civ. P. 166a(c); Walker v. Harris, 924 S.W.2d 375,
377 (Tex. 1996). In reviewing a summary judgment, we assume that all evidence that
favors the nonmovant is true, and we indulge every reasonable inference and resolve
any reasonable doubt in the nonmovant's favor. Valence Operating Co., 164 S.W.3d
at 661.

 A fact is "material" and will preclude summary judgment if it affects the
outcome of the suit under the substantive law. See Collins v. Guinn, 102 S.W.3d 825,
834 (Tex. App.--Texarkana 2003, pet. denied). A material fact issue is "genuine"
only if a reasonable jury could find the fact in favor of the nonmoving party based on
that fact. See Lampasas v. Spring Ctr., Inc., 988 S.W.2d 428, 433 (Tex.
App.--Houston [14th Dist.] 1999, no pet.) (decided under Tex. R. Civ. P. 166a(i)). 
B. "Malooly" and "Global" Issues

 Orion's first and fifth issues, respectively, present broad challenges to the
summary judgment by asking whether the trial court erred by rendering summary
judgment on all of Orion's claims and whether Orion's summary judgment evidence
raised fact issues. The first issue invokes the "Malooly rule," see Malooly Bros., Inc.
v. Napier, 461 S.W.2d 119, 121 (Tex. 1970), and the fifth issue restates the standard
that controls our review of the summary-judgment evidence. See Science Spectrum,
Inc., 941 S.W.2d at 911. These issues are encompassed by our disposition of the
three specific issues that we address below, all of which Orion has supported with
argument and authorities, as required by rule 38.1(h). See Tex. R. App. P. 38.1(h)
(requiring that appellant's brief contain arguments to support contentions). Because
Orion has not supported its first and fifth issues with additional arguments that are
independent of and distinct from its second, third, and fourth issues, we deem the first
and fifth issues addressed by and disposed of by our analysis of Orion's second, third,
and fourth issues. See id.; Henriquez v. Cemex Mgmt., Inc., 177 S.W.3d 241, 255
(Tex. App.--Houston [1st Dist.] 2005, pet. denied) (holding broad "Malooly" point
sufficient to support contention challenging all possible grounds on which summary
judgment rendered, if supported by argument; distinguishing Malooly Bros., Inc., 461
S.W.2d at 121).

Breach of Contract


 As part of its fourth issue, Orion contends that it has viable claims for breach
of contract that are not precluded by the agreement and, therefore, that the trial court
erred by rendering summary judgment in favor of UOP on the breach-of-contract
claim. Orion further contends that the limitations on damages, in articles 7.4 and 7.7
of the agreement, and the duration clauses for the engineering warranty stated in
article 7.1 and the performance guarantee stated Attachment V, article 1.2(b) of the
agreement, are exculpatory provisions that render the agreement "a nullity" and,
therefore, unenforceable as a matter of law. 

A. Interpretation of Written Agreements under Illinois Law

 1. General Principles

 Illinois courts construe contracts de novo as questions of law. See Avery v.
State Farm Mut. Auto Ins. Co., 835 N.E.2d 801, 821 (Ill. 2005). The primary
objective is give effect to the parties' intent, which the court ascertains from the
language used in the agreement. See id.; Lewis X. Cohen Ins. Trust v. Stern, 696
N.E.2d 743, 751 (Ill. App. Ct. 1998); see also W.W. Vincent & Co. v. First Colony
Life Ins. Co., 814 N.E.2d 960, 966 (Ill. App. Ct. 2004). In the absence of ambiguity,
which is also a question of law, but not an issue in this case, courts determine the
parties' intent "'solely from the plain language of the contract'" and may not go
beyond its four corners. See Lewis X. Cohen, 696 N.E.2d at 751 (quoting Tishman
Midwest Mgmt. Corp. v. Wayne Jarvis, Ltd., 500 N.E.2d 431, 434 (Ill. App. Ct.
1986)). Illinois courts accord clear and unambiguous terms their "ordinary and
natural meaning" and must interpret contracts "as a whole, giving meaning and effect
to each provision" in the agreement. Id. (quoting Srivastava v. Russell's Barbecue,
523 N.E.2d 30, 33 (Ill. App. Ct. 1988)). 

 2. Agreements between Business Entities

 It is undisputed that both TransAmerican and UOP were established business
entities and that they negotiated their agreement at arm's length. 

 Illinois public policy, as "found in [the] constitution, statutes[,] and judicial
decisions" of the state, "strongly favors freedom to contract." McClure Eng'g Assocs.
v. Reuben H. Donnelly Corp., 447 N.E.2d 400, 402 (Ill. 1983). (18) An exception may
arise for publicly regulated contracts like those involving innkeepers, landlords, and
professional bailees, for which the Illinois Supreme Court has expressed "judicial
concern with balancing the need to respect the right to freely contract with the need
to protect parties from unfair provisions." Id.; see Willmott v. Fed. Street Advisors,
Inc., No. 05C1124, 2006 WL 3743716, at *8 (N.D. Ill. 2006) (memo op.). 

 This case does not involve a publicly regulated contract. When interpreting
nonregulated contracts that have been negotiated at arm's length between private
business entities, as is undisputed here, Illinois decisions reflect "a widespread policy
of permitting competent parties to contractually allocate business risks as they see
fit." McClure Eng'g, 447 N.E.2d at 402-03; Hicks v. Airborne Express, Inc., 858
N.E.2d 48, 54 (Ill. App. Ct. 2006) (citing McClure Eng'g, 447 N.E.2d at 403); see
also Vigortone AG Prods., Inc. v. PM AG Prods., Inc., 316 F.3d 641, 645 (7th Cir.
2002) (noting, in context of integration clause construed under Illinois law, that
Illinois policy favors enforcing terms of contract negotiated "between sophisticated
commercial enterprises"). 

 3. Exculpatory and Limiting Provisions

 a. In General

 This appeal centers on terms and provisions in the TransAmerican-UOP
agreement that limit the parties' remedies. These terms and provisions include the
following, which appear above in more complete versions: (1) the time limitations
stated in the portion of article 7.1, pursuant to which reperformance by UOP would
be the exclusive remedy for failure of UOP to perform according to accepted
engineering practices; (2) the portion of article 7.2 that refers to Attachment V and
specifies that, except as provided by article 7 or Attachment V, UOP made "NO
WARRANTIES OR GUARANTEES, EXPRESS OR IMPLIED" (emphasis and
upper case in original); (3) the portion of article 7.3 that placed sole responsibility for
detailed design, procurement, construction and maintenance of the unit on
TransAmerican; (4) the portion of article 7.4 that limited UOP's liability for bodily
injury or property damage arising out of its services to those caused by its willful
misconduct or negligence; (5) an additional portion of article 7.5 that barred recovery
from UOP for "special, consequential[,] or indirect damages, including, but not
limited to, loss of profits or loss of use . . . ." (emphasis and upper case omitted here);
(6) the portion of article 7.7 that limited UOP's aggregate liability to $1.4 million,
except for breach of the engineering warranty stated in article 7.1; and (7) the time
limitations on the performance guarantee stated in Attachment V. 

 Illinois courts enforce exculpatory or limiting provisions like these in contracts
that have been negotiated between sophisticated business owners, as here, on the
grounds that competent parties to a business agreement are free to allocate their
respective risks. See McClure Eng'g, 447 N.E.2d at 402-03. In accordance with
settled Illinois policy favoring freedom of contract between business owners,
exculpatory or limiting provisions require no specialized rules of interpretation in
Illinois. See id.

 Under an exception to this policy, Illinois courts will not enforce exculpatory
and limiting provisions when they are unconscionable and result from unreasonable
bargaining power and thus violate the public policy that generally favors freedom of
contract. See Willmott, 2006 WL 3743716 at *8 (surveying Illinois law); see also
Premier Transport, Ltd. v. Nextel Comm., Inc., No. 02C4536, 2003 WL 21267096,
*4 (N.D. Ill., 2003) (unreported memo op.) (same) (citing First Fin'l Ins. Co. v.
Purolator Sec., Inc., 388 N.E.2d 17, 21 (Ill. App. Ct. 1979)) (citing Checkley v. Ill.
Cent. R.R. Co., 100 N.E. 942, 943-44 (Ill. 1913)). Orion does not expressly contend
that the TransAmerican-UOP agreement is unconscionable or that it violates public
policy, but contends that we must construe the agreement against UOP and has relied
on authorities that recognize the exception. 

 Illinois public policy will not bar enforcement of an exculpatory or limiting
provision on grounds of unconscionability unless giving effect to the clause will
categorically absolve the breaching party of any liability for breach of the promise
that forms the basis of the contract. See Jewelers Mut. Ins. Co. v. Firstar Bank
Illinois, 820 N.E.2d 411, 413-15 (Ill. 2004); Willmott, 2006 WL 3743716 at *8
(citing Jewelers Mut., 820 N.E.2d at 415). When enforcing the clause would
categorically absolve the breaching party of any liability for breach, Illinois courts
will strictly construe the limiting, exculpatory language against the party benefitted. 
See Jewelers Mut. Ins. Co, 820 N.E.2d at 414-16); Willmott, 2006 WL 3743716 at
*8 (emphasizing that enforcing agreement construed in Jewelers Mutual would have
completely absolved defendant bank of any liability). 

 Exculpatory and limiting clauses that merely limit remedies do not render a
contract unenforceable. See Willmott, 2006 WL 3743716, *8 (citing Jewelers Mut.,
820 N.E.2d at 415). As the party seeking to avoid an exculpatory clause or limitation,
Orion has the burden to establish unenforceability. Id.; see Reuben H. Donnelley
Corp., 592 N.E.2d at 11. 

 b. The Jewelers Mutual Case

 Orion contends that the limitations on damages, in articles 7.4 and 7.7 of the
TransAmerican-UOP agreement, as well as the time limits for the engineering
warranty in article 7.1 and the performance guarantee in Attachment V, article 1.2(b)
render the agreement unenforceable under Jewelers Mutual, require that we construe
the limitations and exculpatory provisions be construed against UOP, and compel that
we reverse the summary judgment in UOP's favor and remand the cause for a trial on
damages. We disagree.

 In Jewelers Mutual, the Supreme Court of Illinois rejected a bank's attempt to
disclaim liability for theft of over $1 million worth of merchandise stored in three of
the bank's safety-deposit boxes. 820 N.E.2d at 412, 417. Relying on exculpatory
language in the rental contracts executed by jewelers who rented the bank's safety-deposit boxes, the bank had prevailed by summary judgment in the trial court based
solely on the exculpatory clause in the rental contract, pursuant to which the jewelers
who rented the boxes "assume[d] all risks." Id. at 412-13. The Illinois Supreme
Court rejected the bank's reliance on the exculpatory cause. Id. at 417.

 Jewelers Mutual is distinguishable from this case on several grounds. We first
note that ambiguity had not only been raised in the trial court proceedings, but that
the Illinois Supreme Court ruled that the trial court had correctly concluded that the
rental contract for the safety-deposit boxes was ambiguous. Id. at 413, 417. The
ambiguity arose because the contract disclaimed any liability whatsoever, but
simultaneously assumed a duty of care that "formed the heart of the parties'
agreement." Id. at 415. Orion neither claims that the TransAmerican-UOP agreement
is ambiguous, nor directs us to conflicting provisions in the agreement, and we
discern no similarly irreconcilable provisions in the agreement. Accordingly, the
reasoning that required strict construction against the bank in Jewelers Mutual does
not apply, see id. at 413, and we need not construe the TransAmerican-UOP
agreement strictly against UOP in applying Illinois law. 

 The Jewelers Mutual court refused to permit the bank to enforce the assumed-all-risks provision against the jewelers because the bank had not only assumed an
express duty of care in the contract, but, in addition, conceded that it had (1)
negligently carried out that duty and (2) breached the contract. Id. at 413. Given
these circumstances, the court reasoned that permitting the bank to escape liability
based on the assumed-all-risks provision would result in the bank's avoiding liability
even if it were to "hand[] the keys to anyone who came in off the street and asked for
them." Id. T 417. But the circumstances in Jewelers Mutual that warranted departure
from "a wide-spread policy of permitting competent parties to contractually allocate
business risks as they see fit," see McClure Engineering, 447 N.E.2d at 403, have no
correspondingly similar circumstances in this case. 

 Likewise, there is no claim of ambiguity here, and, in contrast to the bank's
posture in Jewelers Mutual, UOP has not conceded either negligence or that it
breached the agreement. More importantly, the exculpatory language in Jewelers
Mutual, which negated any risk for the bank while placing all risk on the renters and
thus compelled a strict construction against the bank, see Jewelers Mutual, 820
N.E.2d at 413, contrasts starkly with the freely negotiated reciprocity of risks and
benefits to both parties in the TransAmerican-UOP agreement. 

 Unlike the safety-deposit rental contracts construed in Jewelers Mutual, the
agreement here does not benefit UOP exclusively while passing all risks to
TransAmerican and its successor, Orion. It is undisputed that all exculpatory portions
of the agreement, like all terms of the agreement, resulted from negotiation between
sophisticated business owners regarding use of newly trademarked technology. 
Though the exculpatory provisions that Orion attacks limited certain damages and
disclaimed warranties or guarantees not recited in the agreement, the remainder of the
agreement simultaneously provides remedies, not only by an engineering warranty
and by a performance guarantee, but also envision reperformance. And though the
agreement imposed time constraints on these latter provisions, it is undisputed that
these constraints likewise resulted from sophisticated business negotiations. In short,
the circumstances that compelled both the reasoning and the outcome in Jewelers
Mutual do not apply to this case. 

 B. Enforcing the TransAmerican-UOP Agreement

 Orion did not meet its burden to establish its claim that the exculpatory and
limiting provisions of the TransAmerican-UOP agreement are unenforceable. See
Willmott, 2006 WL 3743716 at *8; Reuben H. Donnelley Corp., 592 N.E.2d at 11.

 Having been negotiated between two "sophisticated commercial enterprises,"
see Vigortone, 316 F.3d at 645, and McClure Engineering, 447 N.E.2d at 403, the
TransAmerican-UOP agreement afforded two remedies for a perceived breach or
other challenge to TransAmerican, Orion's predecessor-in-interest. The first remedy
appears in article 7 of the main portion of the agreement. Article 7.1 contains UOP's
express, three-year engineering warranty, to perform according to accepted
engineering practices. It is undisputed that before Orion purchased TransAmerican's
assets in 1998, TransAmerican had not asserted a claim for breach of the engineering
warranty within the three-year period stated in article 7.1, which expired on May 1,
1998. Accordingly, the engineering warranty remedy expired on its own terms. 

 The second remedy provided by the agreement, the performance test
contemplated by the performance guarantee in article I, paragraph 1.1 of Attachment
V, is outlined and described fully above. These extensively detailed remedies
provided for redesign or re-engineering of the unit, or both, under the conditions
stated in the TransAmerican-UOP agreement. Based on the May 1, 1995 origin date
of the agreement, the deadline for any performance test under paragraph 1.1 of the
performance guarantee, was May 1, 1998. Because the unit was not completely built
by then, and construction had not even begun until 1997, it is undisputed that the
condition imposed by article 1.2(b) of the Performance Guarantee in Attachment V
could not be met. The performance guarantee, too, thus expired under its own terms
without TransAmerican's having exercised any right to enforce it. (19) 

 UOP moved for summary judgment on Orion's breach-of-contract claim on the
grounds that the engineering warranty and the performance guarantee had expired. 
UOP also relied on the following provisions of the agreement: (1) article 7.2's
uppercased and bold-faced disclaimer of any other "warranties or guarantees, express
or implied," (2) article 7.5's disclaimer of liability for "special, consequential[,] or
indirect damages, including, but not limited to loss of profits or use," and (3) article
7.7's limitation on UOP's aggregate liability to $1.4 million. Orion challenges the
summary judgment by claiming that the time limits and the disclaimers render the
agreement a nullity. 

 The summary judgment record and the law bar Orion from avoiding the
consequences of TransAmerican's failure to enforce the guaranty and performance
terms that TransAmerican had negotiated by claiming that those terms rendered the
agreement unenforceable. Nothing in the summary judgment record raises a fact
issue to support that inference. Given the breadth of the provisions of the engineering
warranty, to comply with accepted engineering practices, and the specificity of the
provisions of the performance guarantee, as negotiated by TransAmerican and
extended in its favor by UOP, we cannot say that UOP's disclaimer, in article 7.2, of
any other "warranties or guarantees, express or implied" renders the agreement an
unenforceable nullity. Likewise, we cannot say that the negotiated disclaimer of
liability in article 7.5, for "special, consequential[,] or indirect damages, including,
but not limited to loss of profits or loss of use" or article 7.7's limitation on UOP's
aggregate liability to $1.4 million, render the agreement an unenforceable nullity. 

 In contrast to the terms of the box-rental contract in Jewelers Mutual, which
passed all risks to the box renters, the limitation in article 7.5 applies only to the
damages specified in article 7.5 and thus merely limits damages without precluding
liability. See Willmott, 2006 WL 3743716, *8-9 (citing Jewelers Mut., 820 N.E.2d
at 414-15). The same provision, article 7.5, also recognizes potential liability for
property damage or property damage caused by UOP's "willful misconduct or
negligence." Similarly, article 7.7 creates an exception to the $1.4 million ceiling for
breach of the agreement's engineering warranty, to perform according to accepted
engineering practices. 

 We conclude that the agreement validly forecloses Orion's successor claims
for breach of contract, and that the trial court properly rendered summary judgment
in favor of UOP on that cause of action. 

 We overrule the portion of the fourth issue in which Orion contends that its
claims for breach of the TransAmerican-UOP agreement remain viable, despite the
terms of that agreement. 

Extra-Contractual, Common-Law Causes of Action 


 In its second issue, Orion contends that it was entitled to pursue its extra-contractual claims, and that the trial court erred by rendering summary judgment in
favor of UOP on those claims. Orion's extra-contractual claims include fraudulent
inducement to contract, fraudulent misprepresentation, and fraudulent promise. 
Through these claims, Orion contends that it is entitled to seek damages from UOP
despite the remedies under the TransAmerican-UOP having expired, because UOP
procured the agreement by fraud, whether by fraudulent inducement, fraudulent
misrepresentation, or fraudulent promise. 

A. Illinois Limitations on Recovery for Fraud

 Recovery for fraud is subject to several limitations in Illinois. We address
those pertinent to this case below.

 1. Fraud is Not an Alternative Remedy for Failed Contract Claims

 Illinois law proscribes recovery in tort "for what is essentially a breach of
contract." Johnson v. George J. Ball, Inc., 617 N.E.2d 1355, 1361 (Ill. App. Ct.
1993). Accordingly, when the terms of a contract bar a suit for breach, as we have
just ruled above, a party to the contract cannot circumvent that bar by seeking
recovery for fraud as an alternative remedy. See id. 

 2. No Recovery for "Promissory Fraud"

 Orion's pleadings include claims for "fraudulent promise." Most jurisdictions
permit a plaintiff to recover in fraud for "a promise made without the intent to
perform," on the grounds that a misrepresentation of intent to perform constitutes the
existing, material misprepresentation that is the predicate to a fraud claim. See Bank
Computer Network Corp. v. Continental Ill. Nat'l Bank & Trust Co., 442 N.E.2d 586,
593, (Ill. App. Ct. 1982) (quoting Prosser, Law of Torts § 109 at 729 (4th ed.
1971)). Illinois courts reject this majority rule. See id. (citing Vance Pearson, Inc.
v. Alexander, 408 N.E.2d 782, 786 (Ill. App. Ct. 1980)). "[M]isrepresentations of
intention to perform future conduct, even if made without a present intention to
perform, do not generally constitute fraud"; fraud requires a misrepresentation of an
"existing" fact. HPI Health Care Servs. Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d
672, 682 (Ill. 1989) (emphasis added). An Illinois claimant may not, therefore,
recover in fraud by claiming that a party to a contract misrepresented his personal
present intent, or the intent of another, to perform a promise in the future. See id.;
Miller v. Sutliff, 89 N.E. 651, 652 (Ill. 1909). 

 As applied to this case, the Illinois bar to a claim of promissory fraud means
that Orion may not rely on statements in the agreement that relate to future intent or
conduct as substantive evidence to raise a material issue of fact in support of Orion's
fraud claims. See HPI Health Care Servs., 545 N.E.2d at 682; Steinberg v. Chicago
Med. School, 371 N.E.2d 634, 641 (Ill. 1977). As stated in the TransAmerican-UOP
agreement, these are to be remedied solely pursuant to the engineering warranty and
performance-guarantee provisions. Similarly, Orion cannot support its fraud claim
by contending that UOP never intended to perform its engineering warranty, to
conform to accepted engineering practices. For statements by UOP concerning future
intent or conduct, Illinois law compels that Orion's only remedy was by an action on
the contract and not by a fraud claim. As we concluded above, though initially
contemplated by the agreement, all contract claims based on the agreement have
expired under the terms of the agreement and are no longer available. 

 An exception to the prohibition against recovery for promissory fraud can arise
when the defendant's false promise or misrepresentation of intent or of future conduct
is part of a "scheme to defraud" through false promises, in which case statements of
future intent may be actionable. See HPI Health Care Servs., 545 N.E.2d at 682; Roda
v. Berko, 81 N.E.2d 912, 915 (Ill. 1948); see also Steinberg, 371 N.E.2d at 641
(approving class action for medical students alleging fraudulent scheme of medical-school admissions); Desnick v. ABC, Inc., 44 F.3d 1345, 1354 (7th Cir. 1995) ("Our
best interpretation [of Illinois law] is that promissory fraud is actionable only if it
either is particularly egregious or, what may amount to the same thing, it is embedded
in a larger pattern of deceptions or enticements that reasonably induces reliance and
against which the law ought to provide a remedy.").

 Orion's pleadings do not refer specifically to the Illinois "scheme to defraud"
exception, but Orion relies on internal communications among UOP employees
pertaining to the CEPOC facility, in particular, yields indicating a "substantial debit"
from that facility, to support its contention that UOP was aware of defects in the
MSCC process. (20) To any extent that Orion may have attempted to invoke the
exception by relying on those communications, they do not raise a material issue of
fact to show that UOP's conduct as to CEPOC was part of a scheme to defraud Orion's
predecessor, TransAmerican. There is no evidence that the internal communications
concerning the CEPOC facility also pertained to the Norco facility or that any of those
communications were either made or disclosed to TransAmerican before the May 1,
1995 onset date of the agreement or before that date. See HPI Health Care, 545
N.E.2d at 682; Bradley Real Estate Trust v. Dolan Assoc., Ltd., 640 N.E.2d 9, 12-13
(Ill. App. Ct. 1994). Furthermore, Orion has consistently taken the position that its
Norco facility, though similar to the CEPOC facility, differs from that facility and is
"unique." Because it is undisputed that the facilities differ, UOP's internal
communications referring to technical problems with the CEPOC unit raise no
material issues of fact that tend to show that UOP's allegedly false promises to
TransAmerican were part of a scheme to defraud. 

 3. Misrepresentations Must Refer to Present or Pre-Existing Facts

 Because statements of future intent or conduct are not actionable as fraudulent
misrepresentations in Illinois and must be remedied through an action on the contract,
a claim of fraudulent misrepresentation can derive only from "statements of present
or preexisting facts." See Bradley Real Estate Trust, 640 N.E.2d at 12-13; see also
HPI Health Care Servs., 545 N.E.2d at 682 (stating that fraud requires a
misrepresentation of an existing fact). 

 Orion grounds its claims of fraudulent misrepresentation on the TransAmerican-UOP agreement signed on May 1, 1995. Because fraud requires a misrepresentation
of an existing fact, HPI Health Care Servs., 545 N.E.2d at 682, to defeat UOP's
motion for summary judgment, Orion had to present competent summary-judgment
evidence of statements, actions, or conduct by UOP that occurred on or before May
1, 1995, the onset date of the agreement date. Therefore, we do not consider evidence
on which Orion relied in the trial court and in this Court that relates to statements by
UOP after the May 1, 1995 onset date of the TransAmerican-UOP agreement. 

B. Misrepresentation as Fraud

 To be actionable as fraud in Illinois, a "misrepresentation" must contain the
following elements: 

 (1) it must be a statement of material fact, as opposed to opinion; 
(2) it must be untrue; 
(3) the party making the statement must know or believe it to be untrue; 
(4) the person to whom the statement is made must believe and rely on
it, and have a right to do so; 
(5) it must have been made for the purpose of inducing the other party to
act; and 
(6) the reliance by the person or entity to whom the statement is made
must lead to the claimed injury.

See Mother Earth, Ltd. v. Strawberry Camel, Ltd., 390 N.E.2d 393, 403 (Ill. App. Ct.
1979) (citing Broberg v. Mann, 213 N.E.2d 89, 91-92 (Ill. App. Ct. 1965)) (21); see also
W.W. Vincent, 814 N.E.2d at 969 (holding that purchasing corporation stated valid
claim of fraudulent misrepresentation by inducement, based on knowingly false
statements, by transferring corporation, that assets transferred to purchasing
corporation included general agents' contract). (22) 

 Orion's live pleadings allege that UOP's fraudulent misrepresentations about
the MSCC process induced TransAmerican to enter into the agreement with UOP, and
that TransAmerican relied on those misrepresentations. Specifically, Orion alleged
that UOP misrepresented (1) that the MSCC process was superior to the former FCC
process; (2) that the process was milli-second, when it was actually "multi"-second;
and (3) that TransAmerican could expect specific yields on implementing the MSCC
process. In moving for summary judgment on Orion's fraud claims, UOP argued, in
part, that there was no reliance by TransAmerican beyond the terms of the agreement
as a matter of law, because the agreement specifies that, "Except as specified in article
7 and in Attachment V, UOP MAKES NO WARRANTIES OR GUARANTEES,
EXPRESS OR IMPLIED." (Emphasis and upper case in original.) 

 Because the only promises made were those expressly stated in the agreement,
which was the parties' "complete" agreement pursuant to article 13, which further
disclaimed any other representations or agreements, UOP argued that Orion had to
establish the requisite element of reliance by its predecessor, TransAmerican.

 1. MSCC as "Milli-Second"--Not A Fraudulent Misrepresentation

 We first address Orion's contention that UOP's fraudulent misrepresentations
are apparent on the face of its agreement with TransAmerican and appear even in its
title ("Milli-Second Catalytic Cracking (MSCC) Process License, Engineering
and Guarantee Agreement") (emphasis added). Orion contends that, because the
MSCC process is not "milli"-second, as UOP allegedly promised, but actually "multi"-second in practice, the TransAmerican-UOP agreement "embodies the fraud," and that
this misrepresentation constitutes actionable fraud on the face of the agreement. We
disagree. 

 It is undisputed that the MSCC process constituted new technology; that the
terms "MSCC" and "MSCC process" were proprietary and trademarked; that the
process was patented; that the agreement incorporates the patent, as Orion has
stipulated, and therefore, that the process was fully disclosed when TransAmerican
and UOP entered into the agreement. Despite the appearance of the term "MSCC" in
both title of the process and the title of the agreement, the summary judgment record
demonstrates that neither the entire process, nor the residence time for hydrocarbons
in the reactor, is described in terms of "milli"-seconds. 

 According to the patent, only the "reaction zone" time is stated in terms of less
than seconds, specifically: "contact time in said reaction zone before passage into the
separation zone" being not greater than [a specified percentage of a second]." (23) 
Reaction-zone time, therefore, and not the entire process, is the only portion of this
technology that is actually stated in terms of milli-seconds. Thus, the timing to which
the title of the agreement refers was known at the time of the agreement. Because only
reaction-zone time is described in terms of milli-seconds, evidence of other, longer-than-milli-second times is not evidence that gives rise to triable issues of material fact
concerning UOP's alleged misrepresentations, given that UOP disclosed the reaction-zone time information at the time of the agreement. 

 2. Remaining Alleged Misrepresentations--No Justifiable Reliance

 In opposing the motion for summary-judgment, in which UOP relied solely on
the terms of its agreement with TransAmerican, Orion claimed that it was entitled to
recover for fraud--despite article 7.2's bold-faced disclaimer of any warranties,
express or implied, article 13's "entire agreement" and disclaimer of other
representations or agreements, and the remedies and performance guarantee provided
by the agreement--because UOP's fraud had vitiated the TransAmerican-UOP
agreement and rendered it unenforceable. 

 Having rejected above Orion's claim that the agreement "embodies the fraud"
by implying that the entire reactor process occurs in milli-seconds, we address Orion's
remaining contentions, as follows: that UOP misrepresented the superiority of the
MSCC process over the former FCC process and that TransAmerican could expect
specific yields on implementing the MSCC process.

 To prevail on this claim under Illinois law, Orion had to establish that
TransAmerican, its predecessor-in-interest, had justifiably relied on UOP's allegedly
fraudulent misrepresentations. See Barille, 682 N.E.2d at 123; Vigortone, 316 F.3d at
645. In accordance with the well-settled general rule, reliance is not justifiable when
the alleged victim of a fraud ignored or "closed his eyes to a known or obvious risk." 
Vigortone, 316 F.3d at 645 (citing Mayer v. Spanel Int'l, Ltd., 51 F.3d 670, 676 (7th
Cir. 1995)); see also Melko v. Dionisio, 580 N.E.2d 586, 592 (Ill. App. Ct. 1991)
(holding that duty of inquiry suspended only if reliance on representations was
"reasonable") (citing with approval AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc., 896
F.2d 1035, 1041 (7th Cir. 1990)). This requirement applies with particular force to
transactions, like the one at issue in this case, that occur between "large, sophisticated
commercial enterprise[s] with relevant experience." See Vigortone, 316 F.3d at 646. 

 To support its claim that UOP misrepresented the performance yields anticipated
through the MSCC process, Orion relied on telecopier transmission to TransAmerican
from Daniel Kauff of UOP, dated May 1, 1995, the onset date of the agreement. The
five-page document consists of a cover sheet and four pages of tables provided to
TransAmerican in response to its request during a meeting that occurred in the previous
week. As reflected in the subject line for the transmission, however, the information
consisted of "MSCC Yield Estimates for RCC Revamp" (emphasis added), and each
of the four tables provided is labeled an "estimate." Furthermore, the cover sheet not
only states that the estimate "is the basis for design, except for some aspects of the
regenerator system," but also refers to additional design "to accommodate the
maximum air rate" and "for higher coke burning capacity if possible." As estimates
only, and estimates that contemplate as-yet-unaccomplished design development, as
well as eventual performance testing in accordance with the agreement, the data
conveyed to TransAmerican on May 1, 1995 is no evidence that UOP knew that the
estimates conveyed were false, and, therefore, is no evidence that UOP knowingly
misrepresented the anticipated yields from the MSCC process at the Norco facility. 

 Orion also relies on an internal e-mail generated from Kauff that is dated May
5, 1995, and thus after the May 1, 1995 date of the TransAmerican-UOP agreement. 
Because the summary judgment record implies that UOP and TransAmerican engaged
in continuing negotiations early in May 1995, despite the May 1 date recited as the
onset date of the agreement, we consider this internal e-mail in determining whether 
Orion raised a material issue of fact concerning TransAmerican's reliance on allegedly
knowing misrepresentation by UOP concerning the MSCC process at the Norco
facility. 

 Kauff's e-mail reports two conversations with TransAmerican on May 5, 1995,
and sets "[s]everal things" to be done on the following Monday by others at UOP
because Kauff would be away from the office. The e-mail sets up a conference call to
respond to TransAmerican's inquiries on the following Monday and states in part as
follows: 

 Bill Byrne from Houston called with many questions on the yield
estimate. When he added up the dollar value of MSCC vs. Brand K, they
were very similar. Further discussion indicates that MSCC gasoline and
LPG are higher, but LCO is lower than Brand K. Since LCO price is
nearly the same as gasoline and far higher than LPG, MSCC does not
score any better on product value. 


 . . . .


 The trickiest part of the conversation was concerning MSCC. Jack
Stanley is convinced that MSCC gives +2 [XXXX (24)]. I was a witness to
this misunderstanding when he and Dave B. were talking last week. Dave
did lead him to believe this is true, by saying that with paraffinic feeds the
[XXXX] was the same as with the automatic feeds, +2 for paraffinic
feeds. Our estimate does not support +2 [XXXX] for TransAm and this
is a problem. Chuck, can we control the damage?


 Contrary to our belief that the project is in the bag, others around Stanley
are still skeptical and asking tough questions. We need to keep on top of
this over the next two weeks to stay on track. 


 In addition to referring to yield estimates, as opposed to fixed guarantees.
Kauff's e-mail discloses "hard questions" by TransAmerican, a misunderstanding by
Stanley concerning a UOP representative's reference to paraffinic feeds, "damage" to
be controlled, and unfavorable comparisons with "Brand K" (UOP's competing bidder,
which had not proposed an MSCC conversion). Neither Stanley's misunderstanding
nor the skepticism and tough questions of those around him constitute actionable
misrepresentations by UOP because they lack justifiable reliance. See Barille, 682
N.E.2d at 123; Vigortone, 316 F.3d at 645. The agreement incorporates a performance
test with specific yield targets, and the agreement disclaims any performance targets
other than those stated in Article V. The summary judgment record does not disclose
what measures UOP took to respond to TransAmerican's concerns, but
TransAmerican's having voiced those concerns does not raise a fact issue concerning
whether TransAmerican justifiably relied on UOP's alleged misrepresentations. See
Vigortone, 316 F.3d at 645; Melko, 580 N.E.2d at 592 (addressing implications for
justifiable reliance when logical and reasonable inquiries not pursued).

 Any reliance by TransAmerican on either allegedly intentional
misrepresentations of yields or allegedly false claims regarding the superiority of the
MSCC process would not have been justified as a matter of law, given the terms of the
agreement and the undertaking envisioned to construct a new facility, using technology
that was undisputedly newly patented. This agreement, which resulted from
negotiations between two sophisticated business enterprises, produced the following
explicit provisions regarding those enterprises' understandings and their apportionment
of risk: (1) article 7.1's express engineering warranty, to perform according to
accepted engineering practices, and the corresponding remedy to reperform at UOP's
expense; (2) Attachment V's express performance guarantee and its extensively
detailed remedies; (3) article 7.2's express disclaimer that, except as provided by the
two preceding provisions, "UOP MAKES NO WARRANTIES OR GUARANTEES,
EXPRESS OR IMPLIED"; and (4) article 13's acknowledgment that the agreement
not only "embodie[d] the entire understanding between the parties relating to the
subject of th[e] agreement," but also disclaimed any "related prior representations or
agreements." (Emphasis and upper case in original.) 

 The TransAmerican-UOP agreement explicitly provides for two express, though
limited-in-time guarantees, one that applied to engineering practices and a second that
applied to performance; and, in addition, the agreement explicitly disclaims any other
warranties or guarantees, whether express or implied and any other representations. 
Accordingly, reliance by TransAmerican on any other representations by UOP, whether
as to yields or superiority of the MSCC was unjustified. 

 As Judge Posner commented in Vigortone, there is no reason to set aside an
agreement when the combined effect of its provisions and the circumstances of the case
negate justifiable reliance as a matter of law. See Vigorton, 316 F.3d at 645. (25) This
reasoning applies with particular force when, as here, the challenged agreement results
from arm's-length negotiations between sophisticated commercial enterprises. See id;
accord McClure Engineering, 447 N.E.2d at 403; Hicks, 858 N.E.2d at 54
(acknowledging Illinois public policy to enforce contractual appropriation and
limitation of risks negotiated between business enterprises). 

 We hold that the TransAmerican-UOP agreement precludes the requisite element
of justifiable reliance to support Orion's fraud claims and that Orion did not raise a fact
issue on justifiable reliance through its summary judgment evidence. Because lack of
justifiable reliance defeats Orion's fraud claims, we overrule Orion's second issue. 

Illinois Consumer Fraud and Deceptive Business Practices Act


 Orion's third issue challenges the summary judgment rendered on its claims
asserted under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815
Ill. Comp. Stat. Ann. 505/2 (West 1998) (Consumer Fraud Act, or, the Act). UOP
opposed Orion's late-filed amended pleadings invoking the Act in the trial court and
also contended that it was entitled to summary judgment on that claim because Orion
could not recover under the Act. We agree that summary judgment was proper. 

Pursuant to the Act, 

 [U]nfair or deceptive acts or practices, including but not limited to the use
or employment of any deception, fraud, false pretense, false promise,
misrepresentation or the concealment, suppression or omission of any
material fact, with intent that others rely upon the concealment,
suppression or omission of such material fact, or the use or employment
of any practice described in Section 2 of the "Uniform Deceptive Trade
Practices Act" . . . in the conduct of any trade or commerce are hereby
declared unlawful whether any person has in fact been misled, deceived
or damaged thereby.


Id. Section 10(a) of the Act creates a remedy for persons who are damaged by conduct
that constitutes a violation of the Act. 815 Ill. Comp. Stat. Ann. 505/10a(a) (West
1998). "The Consumer Fraud Act is a regulatory and remedial statute intended to
protect consumers, borrowers, and business persons against fraud, unfair methods of
competition, and other unfair and deceptive business practices." Robinson v. Toyota
Motor Credit Corp., 775 N.E.2d 951, 960 (Ill. 2002). When the Act applies, it is to be
liberally construed to effectuate its purpose. Id. (26) 

 To prevail under the Act, a claimant must show "(1) a deceptive act or practice
by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3)
the occurrence of the deception during a course of conduct involving trade or
commerce; and (4) actual damage to the plaintiff (5) proximately caused by the
deception." Id.; Oliveira v. Amoco Oil Co., 776 N.E.2d 151, 160 (Ill. 2002). (27) 

 In addition, the Act is directed against conduct "affecting the people of
[Illinois]," 815 Ill. Comp. Stat. Ann. 505/1(f) (West 1998); it has no "extraterritorial
effect." Avery v. State Farm Mut. Auto Ins. Co., 835 N.E.2d 801, 852-53 (Ill. 2005). 
A nonresident of Illinois may pursue a private cause of action under the Act, provided
"the circumstances that relate to the disputed transaction occur primarily and
substantially in Illinois." Gridley v. State Farm Mut. Auto. Ins. Co., 840 N.E.2d 269,
274-75 (Ill. 2005) (citing Avery, 835 N.E.2d at 853-54). 

 In Avery, an attempted class-action premised on claims that State Farm failed to
pay for original equipment manufacturer parts, the Illinois Supreme Court held that the
overwhelming majority of circumstances relating to the claims of the nonresident,
Avery, occurred outside Illinois. Avery, 835 N.E.2d at 854. The circumstances that
negated his claims included the following: Avery was a resident of Louisiana who kept
his car in Louisiana; his accident occurred in Louisiana; the estimate for repairs to his
car was written in Louisiana; the alleged deception, the failure to disclose the
inferiority of nonoriginal equipment manufacturer parts, occurred in Louisiana; his car
was repaired in Louisiana; and he contacted State Farm through a Louisiana agent, a
Louisiana claims representative, and a Louisiana adjuster. Id. The Illinois Supreme
Court applied a similar analysis in Gridley, in concluding that the Act did not apply to
another Louisiana resident. Gridley, 840 N.E.2d at 275. 

 Orion contends that it may properly invoke the Act because UOP's home office
is in Illinois, its alleged deceptions originated from Illinois, and the agreement with
TransAmerican provides that it is to be governed by Illinois law. That the defendant
has its headquarters in Illinois or that the plaintiff contends that the defendant's
"scheme" emanated from Illinois does not suffice to invoke the Act. Avery, 835 N.E.2d
at 855. The same reasoning defeats Orion's reliance on the contractual provision
stating that Illinois law governs the agreement. (28) See id. 

 Orion and its predecessor, TransAmerican, are not Illinois residents, whom the
Act is intended to benefit. See 815 Ill. Comp. Stat. Ann. 505/1(f). Though UOP
generated communications from its home base in Illinois, these were directed to and
transmitted to TransAmerican in Houston, Texas, concerning a Louisiana facility. 
Further, UOP made its sales presentations, and thus, any alleged misrepresentations,
to TransAmerican in Houston, Texas. The circumstances of this case do not relate
"primarily and substantially" to Illinois, but to a Delaware corporation, Orion, and its
predecessor-in-interest, a former Texas corporation, TransAmerican, concerning a
facility in Louisiana, where all of UOP's work would be done. 

 We hold that Orion cannot recover under the Act because the alleged
circumstances that relate to its claims did not occur "primarily and substantially in
Illinois," as that phrase has been construed by the Illinois courts. See Avery, 835
N.E.2d at 853-54. Accordingly, the trial court properly rendered summary judgment
on Orion's claims under the Act.

 We overrule Orion's third issue. 
Economic-Loss Rule Bars Negligence Claims


 In the portion of its fourth issue that we have not yet addressed, Orion challenges
the summary judgment rendered on its negligence claims, on the grounds that these
claims remained viable. Broadly construed, Orion's pleadings encompass general
negligence claims and specific claims of negligent misrepresentation. UOP moved for
summary judgment on the grounds that the economic-loss rule barred any negligence
recovery.

A. General Negligence Claims 

 Orion seeks damages as TransAmerican's successor as compensation for
perceived losses derived from converting the Norco facility to the MSCC process,
including the costs of building the facility. 

 Moorman Mfg. Co. v. Nat'l Tank Co., 435 N.E.2d 443, 450 (Ill. 1982), prohibits
recovery of economic loss in Illinois tort cases. See First Midwest Bank, N.A. v.
Stewart Title Guar. Co., 843 N.E.2d 327, 333-35 (Ill. 2006) (characterizing Moorman
as adopting the "economic loss rule" of most jurisdictions because "'contract law,
which protects expectation interests, provides the proper standard when a qualitative
defect is involved'") (citing and quoting Moorman, 435 N.E.2d 443). 

 "Economic loss" damages seek compensation for "inadequate value, costs of
repair and replacement of the defective product, or consequent loss of profits--without
any claim of personal injury or damage to other property." Moorman, 435 N.E.2d at
449. Economic loss for diminution in value occurs when a product is of inferior quality
and does not work for the general purpose for which it was manufactured and sold. See
id. To recover purely economic loss under a negligence theory, the complaining party
must demonstrate harm that rises above and goes beyond diminished expectations. See
Mars, Inc. v. Heritage Bldrs, 763 N.E.2d 428, 434 (Ill. App. Ct. 2002) (citing
Redarowicz v. Ohlendorf, 441 N.E.2d 324, 327 (Ill. 1982)). The limitation imposed by
the economic-loss rule "holds true" even when, as here, the plaintiff is precluded from
recovering on the contract. Id. (citing Anderson Elec., Inc. v. Ledbetter Erection Corp.,
503 N.E.2d 246, 249 (Ill. 1986)). 

 A party who seeks economic losses alone, but has incurred no other
injury--whether to person or property--is generally precluded from recovery in tort. 
See Bd. of Educ. v. A, C & S, Inc., 546 N.E.2d 580, 586 (Ill. 1989). The distinction
between recovery pursuant to a contract for economic loss and tort recovery for
physical harm to person or other property generally depends on (1) the nature of the
defect and (2) the manner in which the damage occurred. Id. In tort, the claimed defect
results in either personal injury or property damage, and the manner in which the
damage occurs is an accident involving some violence or collision with external
objects. Id. Thus, tort remedies compensate for losses occasioned by personal injuries
or damage to one's property; contract law and the Illinois Uniform Commercial Code
control damages derived from "diminished commercial expectations" that are not
accompanied by injury to person or property. In re Chicago Flood Litigation, 680
N.E.2d 265, 275-76 (Ill. 1997); Moorman, 435 N.E.2d at 450-53; Mars, Inc., 763
N.E.2d at 434. 

 Illinois recognizes three exceptions to the prohibition against seeking contract
damages, i.e., economic-loss damages, in tort, as follows: (1) the plaintiff has sustained
a personal injury or property damage as a result of a sudden or dangerous occurrence;
(2) the plaintiff's damages are proximately caused by the defendant's intentional, false
misrepresentation; or (3) the plaintiff's damages are proximately caused by a negligent
misrepresentation made by a defendant in the business of supplying information for the
guidance of others in their business transactions. Trans States Airlines v. Pratt &
Whitney Canada, Inc., 682 N.E.2d 45, 48 (Ill. 1997); Mars, Inc., 763 N.E.2d at 434. 
Injury to other property or personal injury nonetheless remains a threshold requirement. 
A, C & S, 546 N.E.2d at 586.

 The losses for which Orion has sued UOP in negligence are not compensable
under Illinois law because there is neither personal injury claimed, nor damage to
property other than the Norco facility. See id. To the contrary, Orion's claimed losses
are purely economic losses, in the form of "diminished commercial expectations," and
therefore not compensable in tort. See In re Chicago Flood Litigation, 680 N.E.2d at
275-76; Moorman, 435 N.E.2d at 450-53; Mars, Inc., 763 N.E.2d at 434. 

 The trial properly rendered summary judgment in favor of UOP on the grounds
that the economic-loss rule barred Orion's general negligence claim. 

B. Negligent Misrepresentation Claim

 Orion's claims of negligent misrepresentation invoke the third exception to the
economic-loss rule. Like the general negligence claim, this claim fails at the threshold
because Orion does not seek compensation for personal injury or damage to other
property. A, C & S, 546 N.E.2d at 586. This claim also fails because it would not
apply to UOP regardless, as we explain below.

 To state a claim for negligent misrepresentation, a plaintiff must allege: (1) a
false statement of material fact; (2) carelessness or negligence in ascertaining the truth
of the statement by the party making it; (3) an intention to induce the other party to act;
(4) action by the other party in reliance on the truth of the statement; (5) damage to the
other party resulting from such reliance; and (6) a duty on the party making the
statement to communicate accurate information. Id. at 591; Neptuno Treuhand v.
Arbor, 692 N.E.2d 812, 815 (Ill. App. Ct. 1998). When, as here, the claimant seeks
purely economic damages, Illinois law imposes a duty to avoid negligently conveying
false information only if the defendant is in the business of supplying information for
the guidance of others in their business transactions. Brogan v. Mitchell Int'l, Inc., 692
N.E.2d 276, 278 (Ill. 1998); Moorman, 435 N.E.2d at 452; see also First Midwest
Bank, N.A., 843 N.E.2d at 336 (holding that title insurer not in business of supplying
information in issuing either title commitment or policy of title insurance, for purposes
of exception to Moorman prohibition against recovery of economic losses in tort;
further holding that contract defines title insurer's liability).
 Orion's negligent-misrepresentation claim fails because it is undisputed that the
claim arises in the context of an agreement between two business entities and not from
information provided to guide persons in their business transactions. See First Midwest
Bank, N.A., 843 N.E.2d at 336. Accordingly, the economic-loss rule applies under
Illinois law. UOP was entitled to prevail by summary judgment on its contention that
the economic-loss rule barred recovery.

 We overrule the remaining portion of Orion's fourth issue. 

Petition-in-Intervention by Stanley 


A. Standard of Review

 Stanley brings a single issue, in which he contends that the trial court abused its
discretion by striking his petition-in-intervention in response to UOP's motion. See
In re Lumbermens Mut. Cas. Co., 184 S.W.3d 718, 722 (Tex. 2006) (applying abuse-of-discretion standard governing trial-court rulings on petitions to intervene on appeal);
Univ. Sav. Ass'n v. Intercontinental Consol. Cos., 751 S.W.2d 657, 662 (Tex.
App.--Houston [1st Dist.] 1988), aff'd sub nom., Guar. Fed. Sav. Bank v. Horseshoe
Operating Co., 793 S.W.2d 652 (Tex. 1990); Tony's Tortilla Factory, Inc. v. First
Bank, 857 S.W.2d 580, 589 (Tex. App.--Houston [1st Dist.] 1993), rev'd on other
grounds, 877 S.W.2d 285 (Tex. 1994). 

 Rule 60 of the Rules of Civil Procedure permits a party to intervene in a pending
lawsuit "subject to being stricken out by the court for sufficient cause on the motion of
any party." Tex. R. Civ. P. 60. The burden is on the party who opposes intervention,
here UOP. See id. A trial court abuses its discretion by striking a petition-in-intervention without a motion to strike having been filed when (1) the intervenor could
have brought some or all of the same action in his own name, or, if the action had been
brought against the intervenor, he could have defeated the action in whole or in part,
(2) intervention will not complicate the case by excessive multiplication of the issues,
and (3) intervention is almost essential to protect the intervenor's interest. Guar. Fed.
Sav. Bank v. Horseshoe Operating Co., 793 S.W.2d 652, 657 (Tex. 1990); Tony's
Tortilla Factory, 857 S.W.2d at 589. 
B. No Abuse of Discretion

 Stanley, former chief executive officer of the now dissolved TransAmerican,
sought to intervene to sue UOP for damages for the loss of his investment in
TransAmerican. Stanley cannot satisfy the first element of Guarantee Federal Savings
test because he could not bring an independent action against UOP. 

 Stanley was not a party to the agreement in any individual capacity. It is
undisputed that TransAmerican's successor, Orion, became the owner of Stanley's
former company when TransAmerican transferred its assets to Orion. These assets
necessarily included any cause of action owned by TransAmerican relating to property,
and, therefore, any cause of action relating to the Norco facility. See White v.
Independence Bank, N.A., 794 S.W.2d 895, 897 (Tex. App.--Houston [1st Dist.] 1990,
writ denied) (holding that claims of corporation vest in corporation). As a result of the
transfer, any rights that TransAmerican had against UOP vested in Orion.

 As a shareholder of TransAmerican, Stanley could not have sued in his own
name and for his benefit, even if he were injured in his status as a shareholder before
the company's assets were transferred to Orion. See El T Mexican Rests., Inc. v. Bacon,
921 S.W.2d 247, 251 (Tex. App.--Houston [1st Dist.] 1995, writ denied); Kenneth H.
Hughes Interests, Inc. v. Westrup, 879 S.W.2d 229, 235 (Tex. App.--Houston [1st
Dist.] 1994, writ denied). In Kenneth H. Hughes Interests, this Court rejected a similar
claim by a corporate officer and shareholder who sued, individually, for loss of
investment in a company, reasoning that permitting only the company to sue permits
the company to be made whole, which, in turn, benefits the shareholder. See id., 879
S.W.2d at 235. Stanley alleges no cause of action that is independent of his
shareholder status.

 Because Stanley, as a shareholder, could not bring his suit independently, the
trial court did not abuse its discretion by denying his plea-in-intervention. 

 We overrule Stanley's sole issue.

Conclusion


 We affirm the judgment of the trial court.

 

 


 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justices Jennings and Bland.
1. This record on appeal has been partially sealed by order of the trial court. See Tex.
R. Civ. P. 76a. 
2. 815 Ill. Comp. Stat. Ann. 505/2 (West 1998). 
3. The rubric "MSCC" stands for the trademarked term, "Milli-Second Catalytic
Cracking." The agreement refers to the both MSCC and Milli-Second Catalytic
Cracking as "proprietary names." 
4. With respect to licensing, the agreement provided for a mutual exchange of rights
pertaining to UOP's patent rights. The agreement describes the license as
"nonexclusive" and recites that it was granted to UOP and its subsidiaries, both of
which were granted the right to grant sublicenses. 
5. As defined in the TransAmerican-UOP agreement, the milli-second aspect of the
MSCC process implies that many factors, in addition to those described as milli-second, will occur simultaneously. The contract defines the MSCC process as
follows: "a process for converting a charge stock consisting essentially of petroleum-type hydrocarbons which are liquid at high or normal temperature and normal
pressure, primarily to produce motor fuels or other liquid fuels or napthas of an
average, molecular weight lower than that of the charge stock, together with by-product, normally gaseous hydrocarbons, such conversion being carried out:


 a. at temperatures in excess of 500 degrees Fahrenheit,


 b. with a solid catalyst present in a non-riser reaction zone for the specific
purpose of effecting or influencing the reaction and whereby there is
produced a result as to yield, character of product or speed of reaction
different to a definitely determinable degree from the result which
would be produced with the same starting materials under conditions
otherwise the same but in the absence of such catalyst, and 


 c. without significant chemical consumption of hydrogen;


 and in which process:


 d. the conversion and catalyst regeneration proceed in separate zones with
transfer of catalyst between zones,


 e. the catalyst is maintained in the reaction zone in the form of an
essentially horizontally flowing fluid mass made up of finely divided
catalyst dispersed in the hydrocarbon vapors undergoing conversion,
and


 f. the average residence time of the catalyst in the reaction zone is greater
than the average residence time of the hydrocarbon vapors in said zone.
6. Orion's pleadings state that TransAmerican acquired the Norco unit in 1971. The unit
was built in 1969, but had been shut down from 1983 until 1994, when
TransAmerican began the rebuilding program that included converting to the MSCC
process. 
7. The Norco unit was to be converted to the MSCC process from the Fluidized
Catalytic Cracking (FCC) process, which had previously been the norm for catalytic
conversion for refineries. 
8. According to Orion, its "stakeholders . . . are the unpaid creditors who loaned
[TransAmerican] the money to build the unit at the refinery that is the subject matter
of this dispute."
9. See C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 780-81 (Tex.
App.--Houston [1st Dist.] 2004, no pet.) (addressing implications of asset transfer);
Tex. Bus. Org. Code Ann. § 10.254 (Vernon 2006) ("Disposition of Property Not
a Merger or Conversion; Liability"). 
10. This case does not involve or address any claims related to the study or to any other
agreement, to the extent that any may exist. 
11. We refer to article 7.1 as the engineering warranty.
12. Attachment I to the agreement defined "Start of Initial Operation" as "that moment
when hydrocarbons are first introduced into the battery limits of the Unit with the
intent to operate the MSCC Process." 
13. We refer to the provisions of Attachment V as the performance guarantee.
14. Attachment I to the agreement defined "Performance Test" as "a period of three (or
less[,] if mutually agreed) consecutive Operating Days scheduled for the purpose of
comparing the performance of the Unit with the Performance Guarantee." 
Attachment I defined "Operating Day" as "a continuous period of 24 hours during
which the Unit is on stream." 
15. The maximum rate for catalyst consumed was not specified, pending receipt of further
information from "the cyclone vendor."
16. The five remaining conditions addressed conformity to UOP's design specifications;
UOP approval of the catalyst used; furnishing of all required materials, facilities, and
personnel by TransAmerican; operation, shutdown, and restarting per UOP's
instructions; UOP presence before and during performance testing; and testing in
conformity with the terms of the agreement.


 Pursuant to paragraph 2.1 of Attachment V, UOP would conduct the first performance
test within 90 days of the Start of Initial Operation. Paragraph 2.2 provided that UOP
would determine and notify TransAmerican whether "the applicable Performance
Guarantee [was] met" and that the guarantee would "be deemed to have been met"
unless TransAmerican disputed UOP's notice within 15 days. Paragraph 3.1 defined
the parameters of UOP "option to fix" or, alternatively, a schedule of liquidated
damages, should the Performance Guarantee not be met "during the Performance Test
permitted under paragraph 2.1." 
17. Orion's arguments on appeal encompass tort claims and contract claims. Orion's
appellant's brief asserts rights under Illinois law, but Orion also relies on Texas law. 
The same is true of UOP. Both parties relied virtually exclusively on Illinois law in
the trial court until very late in the case, when Orion began to invoke Texas precedent
to support its position. Article 15, the choice-of-law provision in the TransAmerican-UOP agreement, which is entitled "Governing Law," states that "[t]his agreement
shall be governed by the laws of the State of Illinois." (Emphasis added.) A choice-of-law provision that addresses only the parties' agreement, as here, "does not purport
to encompass all disputes between the parties or to encompass tort claims" that do not
depend on interpretation and enforcement of the agreement. Stier v. Reading & Bates
Corp., 992 S.W.2d 423, 433 (Tex. 1999). Trial courts may not render summary
judgment for a reason not presented to the trial court, and this Court may address only
those grounds actually presented to the trial court. See Cincinnati Life Ins. Co. v.
Cates, 927 S.W.2d 623, 625 (Tex. 1996). UOP's motion and its replies, as well as
Orion's responses, must "stand or fall," therefore, on the grounds presented in those
filings in the trial court. See Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 912
(Tex. 1997). Because UOP did not dispute that Illinois law applied and relies on the
Illinois choice-of-law provision, moreover, in briefing its third issue, we decline to
determine sua sponte whether Texas law governs Orion's tort claims. 
18. See McClure Eng'g Assocs. v. Reuben H. Donnelly Corp., 447 N.E.2d 400, 402 (Ill.
1983) (defining "public policy" as principle declaring that "no one may lawfully do
that which has a tendency to be injurious to the public welfare").
19. It is undisputed that construction was delayed by the financial difficulties that resulted
in foreclosure by TransAmerican's creditors and its ultimate bankruptcy filing. We
note that no summary judgment evidence shows or suggests that TransAmerican
attempted to renegotiate the agreement in order to extend the May 1, 1998 expiration
date of either the engineering warranty or the performance guarantee. 
20. An internal e-mail from UOP's Larry Upson on April 13, 1995 concerns the CEPOC
facility in New Jersey. Upson states that, on reviewing an MSCC report by another
individual, he "realized that [he] had erred" in an earlier comparison of "actual
CEPOC MSCC data" and "predicted results for a current day UOP riser at the same
operating and feed conditions" and had "redone the comparison." Upson then
reported that 


 This new apples v. apples comparison now makes the MSCC
results look considerably less attractive. These data would
indicate a substantial debit for gasoline yield, conversion, and
bottom cracking for MSCC. MSCC still appears to have a dry
gas advantage, although the advantage is now much smaller. 


 Since the data in this comparison comes from the period prior to
the improvement in CEPOC's material balance, a similar
evaluation of the more recent data may provide a different view
of MSCC capabilities. I'll try to provide a comparison in the
near future. 


 Despite reporting a "substantial debit," Upson's e-mail addresses implementation of
the MSCC process at the CEPOC unit, which Orion has consistently described as a
"different" facility. Upson's e-mail is no evidence of the MSCC process at the
TransAmerican Norco unit. Moreover, Upson's e-mail clearly encompasses variables
at the CEPOC facility, for example, the recent "improvement in CEPOC's material
balance," which, Upson envisions, could produce a different comparison. 
21. Mother Earth is considered the "seminal case" for analyzing fraud in Illinois. Luciani
v. Bestor, 436 N.E.2d 251, 256 (Ill. App. Ct., 1982); cf., Soules v. General Motors
Corp., 402 N.E.2d 599, 601 (Ill. 1980) (stating, in context of claim of fraudulent
misrepresentation, that plaintiff must show that defendant made a false statement of
material fact, with either knowledge or belief that it was false and with intent to
induce plaintiff to act, that plaintiff acted in reliance on truth of statement and
suffered damage as result, and that plaintiff's reliance must have been specifically
justified by right to rely); Barille v. Sears, Roebuck & Co., 682 N.E.2d 118, 122-23
(Ill. App. Ct. 1995) (stating elements as (1) false statement of material fact, (2) known
or believed to be false by party making it, (3) intent to induce other party to act, (4)
action by other party in justifiable reliance on truth of statement, and (5) damage to
other party from such reliance). 
22. W.W. Vincent also held that the purchasing corporation stated a cause of action for
fraudulent concealment because the transferring corporation had a duty to disclose
that the assets transferred did not include the general agents' contract, as the
transferring corporation had initially represented. W.W. Vincent & Co. v. First Colony
Life Ins. Co., 814 N.E.2d 960, 969-70 (Ill. App. Ct. 2004). Orion has not specifically
alleged a cause of action for fraudulent concealment, but does argue that UOP
perpetrated an ongoing fraud by not disclosing to TransAmerican details concerning
MSCC performance at the CEPOC facility. 


 But, neither the TransAmerican-UOP agreement nor Illinois law imposed a
duty to disclose on UOP. With respect to the agreement, article 5.1, which addresses
"Technical Information," does not impose a duty of disclosure, but, rather, provides
that UOP's technical information would be "available to TransAmerican through
UOP or its nominee," (emphasis added) and thus on request. Moreover, as the
remaining provisions of article 5 demonstrate, this portion of the agreement imposed
a duty on TransAmerican and, therefore, Orion, not to disclose, but to safeguard the
trademarked patent information conveyed by the agreement. 


 With respect to the common law, Illinois courts impose a duty to disclose only
in the context of a special or fiduciary relationship, which this case does not involve. 
See Neptuno Treuhand v. Arbor, 692 N.E.2d 812, 817 (Ill. App. Ct. 1998). The duty
to disclose recognized in W.W. Vincent arose because of allegations that the
transferring corporation had falsely misrepresented that the assets of the corporation
included the general agents' contract and, therefore, income from the contract;
because the assets did not actually include the general agents' contract, the
transferring corporation had a duty to correct its fraudulent misrepresentation. W.W.
Vincent, 814 N.E.2d at 969. 
23. Specified percentage omitted based on redaction and sealing order by trial court. 
24. Rubric changed in accordance with trial court's sealing order.
25. The disposition in Vigortone does not result from enforcing provisions of the contract
construed in that case, but from analyzing the evidence, which negated justifiable
reliance as a matter of law. See 316 F.3d at 645-46. 
26. The Act "protects consumers who purchase merchandise or home improvement
services for their own use" and applies to both individual consumers and
"relationships among business persons engaged in trade or commerce." Barille, 682
N.E.2d at 124. Though the Act was amended in 1990 to provide that "'[p]roof of a
public injury, a pattern, or an effect on consumers generally shall not be required,'"
Illinois case law continues to apply the general rule that "the Act does not apply to
every commercial transaction regardless of the relationship between the parties." Id.
(quoting 815 Ill. Comp. Stat. Ann. 505/10a (West 1994)). "[T]he relevant inquiry
remains whether the alleged conduct involves trade practices addressed to the market
generally or otherwise implicates consumer protection concerns." Id. Applying this
inquiry in Barille, the Illinois appellate court stated that the Act does not apply when
there is no showing that the defendant's actions "affected competition, caused
confusion to customers, influenced the market generally or otherwise implicated
consumer[-]protection concerns." Id. There must be a showing of either (1) conduct
that violates public policy or (2) oppressive conduct that leaves the consumer with
little alternative but to submit. See Robinson v. Toyota Motor Credit Corp. 775
N.E.2d 951, 961, 963 (Ill. 2002). 
27. There must be a showing that the defendant intended that the plaintiff rely on the
statement, but, in contrast to common-law fraud, the plaintiff need not establish its
actual reliance on the statement. See Oliveira v. Amoco Oil Co., 776 N.E.2d 151, 161
(Ill. 2002); Barille, 682 N.E.2d at 124; Martin v. Heinold Commodities, Inc., 643
N.E.2d 734, 754 (Ill. 1994); Siegel v. Levy Org. Dev. Co., 607 N.E.2d 194, 198 (Ill.
1992). The plaintiff must, however, establish that it was deceived in order to satisfy
the statutory requirement of proximate cause. Oliveira, 776 N.E.2d at 163. Because
the plaintiff may recover under the Act only if the alleged fraud proximately caused
the claimed injury, Martin, 643 N.E.2d at 746-47, recovery must be premised on
statements made before the transaction. Connick v. Suzuki Motor Co., 675 N.E.2d
584, 594 (Ill. 1996) (citing Ill. Comp. Stat. Ann. 505/2). Statements made after the
transaction are not probative. Id.; cf., Rockford Mem. Hosp. v. Havrilesko, 858
N.E.2d 56, 62-63 (Ill. App. Ct. 2006) (stating that concealed fact must have been
known to defendant when it was concealed). 
28. Yet, Orion has also relied on Texas law, as we noted in addressing that we apply the
Illinois law on which both parties relied in moving for summary judgment and
responding to the motion.